[This opinion has been published in *Ohio Official Reports* at 78 Ohio St.3d 284.]

CARREL, APPELLANT, V. ALLIED PRODUCTS CORPORATION, APPELLEE, ET AL.

[Cite as *Carrel v. Allied Products Corp.*, 1997-Ohio-12.]

*Products liability—Civil actions—Common-law action of negligent design survives enactment of Ohio Products Liability Act—Employer and employee—Torts—In a products liability case, assumption of the risk may be a viable defense against an employee injured by a defective product in the workplace—Employee deemed to have voluntarily exposed himself to risk, when—Defense of assumption of risk not available, when.*

1. The common-law action of negligent design survives the enactment of the Ohio Products Liability Act, R.C. 2307.71 *et seq.*

2. In a products liability case, assumption of the risk may be a viable defense against an employee injured by a defective product in the workplace. An employee will be deemed to have voluntarily exposed himself or herself to a risk when he or she has elected to use a defective product. However, the defense of assumption of the risk is not available when the employee is required to encounter the risk while performing normal job duties. (*Cremeans v. Willmar Henderson Mfg. Co.* [1991], 57 Ohio St.3d 145, 566 N.E.2d 1203, explained and followed.)

(No. 95-1773—Submitted October 15, 1996—Decided April 23, 1997.)

APPEAL from the Court of Appeals for Marion County, No. 9-94-24.

———————————

{¶ 1} On July 13, 1988, plaintiff-appellant, Donald Carrel, an employee of Whirlpool Corporation, was injured while working on a six-hundred-ton transfer press. This press was designed and manufactured by Verson Allsteel Press Company, now a division of Allied Products Corporation ("Allied"), defendant-

appellee. At the time of the injury, appellant was assisting a co-worker in determining the cause of the misalignment of a workpiece.

{¶ 2} The Verson Transmat 600 Press is a ten-station press approximately twenty feet in length and five feet in width. A ram, on which ten upper dies can be mounted, runs the length of the press. Steel is fed into one end of the press and progressively moves along ten die stations through the use of transfer fingers. When the cycles are complete a part is formed. The press operates in two modes, automatic and inch.

{¶ 3} At the time of the accident, the press had barrier guards running the length of the die spaces that, when in the down position, prevented access to the point of operation. These guards were electrically interlocked only when the press was in the automatic mode.

{¶ 4} On the evening in question, appellant, who was assigned to operate a Transmat four-hundred-ton press, was assisting a newly trained co-worker, Stephen Price, in determining the cause of a misaligned workpiece on the Verson Transmat 600 press, which Price had been assigned to operate.

{¶ 5} To determine why the workpiece was misfeeding, it was necessary to take the press out of the automatic mode and place it in the inch mode. The inch mode allows the operator to incrementally stroke the press to watch the action of the various components and to bring the transfer fingers to the desired extension.

{¶ 6} Immediately prior to the accident, appellant was adjusting the transfer fingers on the back length of the press at station eight. Price was on the front length of the press directly across from appellant and was likewise adjusting the transfer fingers on his side of the press. They were able to see each other through the three-and-one-half-inch space between the die halves and were both looking at the alignment of the workpiece. Appellant assumed that his co-worker recognized what steps would have to be taken to get the piece properly aligned in the die space. Price, however, thought the piece was properly aligned. He testified that he went

2

to the control panel, sounded the warning horn, and activated the press. Appellant's left hand (his dominant hand) was in the die space. When the die halves came together, appellant sustained a partial amputation of his left index and left ring finger and a complete amputation of his left middle finger.

{¶ 7} The configuration of the press made it impossible for appellant to communicate with Price while he was operating the press. One of appellant's experts averred that this is a common problem on large, straight presses like the Verson Transmat 600 press. Both of appellant's experts averred that in order to prevent injury to a person performing adjustments, the press must have interlocked barrier guards to prevent the machine from cycling not only in automatic mode, but also in inch mode.

{¶ 8} While the press did not have this electrical interlocked barrier guard in the inch mode, this feature was available at the time the press was designed and had been incorporated into the design of other Verson Transmat presses prior to the design of the press in question.

{¶ 9} At the time of the accident, appellant had been employed with Whirlpool almost twenty years. Appellant was an experienced and skilled press operator and was, in fact, assisting a new press operator at the time. Moreover, the press was equipped with several safety features, such as a safety cable, stop buttons, a warning horn, and warning plates. The co-worker sounded the warning horn prior to activating the press; however, the horn, sounding similar to warning horns on other presses in the factory, failed to notify appellant that the press was about to be activated.

{¶ 10} In April 1990, appellant filed his complaint against Allied, raising, under R.C. 2307.71 *et seq.*, Ohio's Products Liability Act, claims of defective design and inadequate warnings, among others. In addition to these statutory claims, appellant also brought a common-law claim for negligent design.

**{¶ 11}** Allied moved for summary judgment on the statutory products liability claims and the common-law negligence claim on the basis of assumption of risk. Appellant moved for summary judgment on the issue of assumption of the risk. The trial court granted Allied's motion and denied appellant's motion. The trial court further found that appellant's common-law negligent design claim was statutorily abrogated by R.C. 2307.71 *et seq.,* and, thus, Allied was entitled to judgment on that claim as well. The court of appeals affirmed.

**{¶ 12}** The cause is now before this court pursuant to the allowance of a discretionary appeal.

_____

*Nurenberg, Plevin, Heller & McCarthy Co., L.P.A., Richard C. Alkire* and *Sandra J. Rosenthal,* for appellant.

*Michael Garth Moore* and *Mark Hellner,* for appellee.

*James D. Dennis*, urging reversal for *amicus curiae,* Ohio Academy of Trial Lawyers.

_____

FRANCIS E. SWEENEY, SR., J.

**{¶ 13}** This case presents three issues for our review. First, we are asked to decide whether a common-law cause of action, negligent design, survives the enactment of R.C. 2307.71 *et seq.,* the Ohio Products Liability Act. In addition, the court is asked to determine whether the law applicable to assumption of the risk as set forth in *Cremeans v. Willmar Henderson Mfg. Co.* (1991), 57 Ohio St.3d 145, 566 N.E.2d 1203, is available under R.C. 2307.71 *et seq.* Finally, we must decide whether summary judgment was erroneously entered in the manufacturer's favor. For the following reasons, we answer these questions in the affirmative. Accordingly, the judgment of the court of appeals is reversed.

I

**{¶ 14}** We must first decide whether a common-law cause of action for negligent design survives the enactment of the Products Liability Act. The court of appeals found that the General Assembly, by codifying products liability law, had abrogated the common-law negligent design claim.[1] In reaching this determination, the appellate court considered the General Assembly's failure to specifically mention the common-law negligent design cause of action in either R.C. 2307.72 or R.C. 2307.78(A)(1).[2] The court concluded that the statutes' silence meant that the General Assembly had chosen to eliminate this type of action against a manufacturer.

**{¶ 15}** Although Allied agrees with the court of appeals' determination that the Act abrogates common-law causes of action against a manufacturer for products liability, it bases its argument on R.C. 2307.71(M) and 2307.73, in addition to R.C. 2307.72.

**{¶ 16}** We find these assertions and conclusions contrary to well-established rules of statutory construction, as well as this court's recent decision in *McAuliffe v. W. States Import Co., Inc.* (1995), 72 Ohio St.3d 534, 651 N.E.2d 957.

**{¶ 17}** According to principles of statutory construction, the General Assembly will not be presumed to have intended to abrogate a common-law rule unless the language used in the statute clearly shows that intent. *State ex rel. Morris v. Sullivan* (1909), 81 Ohio St. 79, 90 N.E. 146, paragraph three of the syllabus.

---

1. At common law, products liability law, an outgrowth of the laws of contracts and negligence, evolved as a separate, identifiable body of law. *Bowling v. Heil Co.* (1987), 31 Ohio St.3d 277, 279, 31 OBR 559, 561, 511 N.E.2d 373, 375. While products liability cases often involved issues of negligence as well as strict liability, these doctrines have consistently been regarded as complementary but distinct. *Id.*

2. In R.C. 2307.72, the General Assembly clearly expressed its intent that nonstatutory forms of relief not be superseded in the area of environmental actions. R.C. 2307.78(A)(1) expressly provides that a negligence action may be brought against a supplier.

Thus, in the absence of language clearly showing the intention to supersede the common law, the existing common law is not affected by the statute, but continues in full force. *Id.* "There is no repeal of the common law by mere implication." *Frantz v. Maher* (1957), 106 Ohio App. 465, 472, 7 O.O.2d 209, 213, 155 N.E.2d 471, 476.

{¶ 18} R.C. 2307.71(M)[3] defines the statutory products liability claim. Although couched in broad language, this definition does not mention or otherwise discuss the common-law action of negligent design. More important, there is no explicit statement that this definition was meant to abolish common-law actions sounding in negligence.[4] The same can be said about R.C. 2307.73. This section provides that a manufacturer is subject to liability for compensatory damages based on a products liability claim if the claimant establishes that the product is defective as found within the specific subsections of the Act addressing manufacture (R.C. 2307.74), design (R.C. 2307.75), warning (R.C. 2307.76), or representation (R.C. 2307.77). Again, there is no explicit statement that they are the only products liability claims that may be pursued against a manufacturer.

{¶ 19} But Allied argues that the General Assembly did clearly express its intention that all products liability claims must be brought pursuant to R.C. 2307.71 *et seq.* Allied relies upon the statement of R.C. 2307.72(A) that any recovery for

---

3. As defined in R.C. 2307.71(M), "product liability claim" means "a claim that is asserted in a civil action and that seeks to recover compensatory damages from a manufacturer * * * for * * * physical injury to person * * * that allegedly arose from any of the following:

"(1) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;

"(2) Any warning or instruction, or lack of warning or instruction, associated with that product;

"(3) Any failure of that product to conform to any relevant representation or warranty."

4. Compare R.C. 2901.03, where the General Assembly clearly expressed its intention to replace common-law criminal offenses: "No conduct constitutes a criminal offense against the state unless it is defined as an offense in the Ohio Revised Code."

compensatory damages on a products liability claim is *subject to* R.C. 2307.71 to 2307.79.

{¶ 20} However, as *amicus curiae,* the Ohio Academy of Trial Lawyers, aptly points out, the phrase "subject to" is not strong enough to completely eliminate unmentioned common-law theories. The rule of strict construction refuses to extend the law by implication or inference and recognizes nothing that is not expressed. Accordingly, it would be a departure from well-recognized principles of statutory construction to read into a statute words not found in its text. *Iron City Produce Co. v. Am. Ry. Express Co.* (1926), 22 Ohio App. 165, 153 N.E. 316.

{¶ 21} Further support for this interpretation can be found in R.C. 2307.75, which addresses design defects. This section merely codifies the strict liability common-law theories embraced in *Leichtamer v. Am. Motors Corp.* (1981), 67 Ohio St.2d 456, 21 O.O.3d 285, 424 N.E.2d 568, and *Knitz v. Minster Machine Co.* (1982), 69 Ohio St.2d 460, 23 O.O.3d 403, 432 N.E.2d 814. Again, the statute is silent as to the common-law negligent design claim.

{¶ 22} This reasoning is also supported by this court's decision in *McAuliffe, supra,* where the majority implicitly recognized that the Products Liability Act did not supplant the common law applicable to products liability claims. This court specifically held in its syllabus that the Act "does not provide a cause of action that would not exist but for the statute." In reaching this holding, the court reversed an appellate court decision that had applied the statute of limitations for liabilities created by statute to a products liability claim. The appellate court did so because it found that the new products liability law contained in R.C. 2307.71 *et seq.* had abrogated actions at common law. The *McAuliffe* majority held that the court of appeals had applied an incorrect test and, instead, should have focused on whether the cause of action would not have existed "but for" the new statute. The majority stated that "[a]ny statutory 'modification,

alteration or conditioning' of a common-law cause of action which falls short of creating a previously unavailable cause of action does not transform that cause of action into 'an action * * * upon a liability created by statute." *Id.,* 72 Ohio St.3d at 538, 651 N.E.2d at 960. Since products liability actions preceded the adoption of the new law, the majority concluded the "but for" test was not satisfied, making the limitations period for liabilities created by statute inappropriate. *Id.* at 538-539, 651 N.E.2d at 960-961.

{¶ 23} In two later cases, Justice Douglas correctly remarked that "[g]iven the majority opinion in *McAuliffe*, it should now be understood that all common-law products liability causes of action survive the enactment of R.C. 2307.71 *et seq.,* the Ohio Products Liability Act, unless *specifically* covered by the Act because the Act, according to the majority in *McAuliffe,* '* * * falls short of creating a previously unavailable cause of action * * *.' " (Emphasis *sic*.) *Byers v. Consol. Aluminum Corp.* (1995), 73 Ohio St.3d 51, 52, 652 N.E.2d 643, 644 (Douglas, J., dissenting); *Curtis v. Square-D Co.* (1995), 73 Ohio St.3d 79, 652 N.E.2d 664 (Douglas, J., dissenting).

{¶ 24} Accordingly, we hold that the common-law action of negligent design survives the enactment of the Ohio Products Liability Act, R.C. 2307.71 *et seq.*

II

{¶ 25} We are next asked to construe *Cremeans v. Willmar Henderson Mfg. Co.* (1991), 57 Ohio St.3d 145, 566 N.E.2d 1203, as applied to actions accruing after the effective date of the Products Liability Act.

{¶ 26} At common law, the notion developed that the affirmative defense of assumption of the risk was an absolute bar to recovery in a products liability case for a plaintiff who voluntarily and unreasonably assumed a known risk. *Onderko v. Richmond Mfg. Co.* (1987), 31 Ohio St.3d 296, 31 OBR 576, 511 N.E.2d 388, syllabus. The General Assembly has endorsed this defense in products liability

cases codified in R.C. 2307.71 *et seq*. See R.C. 2315.20. For the defense of assumption of the risk to act as a bar to recovery of damages, the defendant must establish that the plaintiff knew of the condition, that the condition was patently dangerous, and that the plaintiff voluntarily exposed himself or herself to the condition. *Goodin v. Corry* (1982), 5 Ohio App.3d 178, 5 OBR 362, 450 N.E.2d 727. Ordinarily, assumption of the risk is a question of fact, to be resolved by the factfinder. *Id.* However, the issue presented here is whether, in light of this court's decision in *Cremeans,* this defense is available in a products liability action when the plaintiff is injured in the workplace.

{¶ 27} In *Cremeans*, an employee was injured while operating a loader inside a fertilizer bin when an avalanche of fertilizer caused the rear wheels of the loader to lift, wedging the employee between the seat and an overhead structure inside the bin. The loader was alleged to be defective because it did not have a protective cage. The employee knew that avalanches occurred and was concerned that the loader did not have a protective cage, but continued to use the loader because it was his job to do so. The employer intentionally ordered the loader without this safety feature because the bins were too small to use the loader with a cage.

{¶ 28} The lead opinion noted the reality that an employee often has little choice as to whether he or she will encounter risks in the employment setting. The opinion noted that the fear of dismissal and the prospect of finding new employment in a limited job market precludes the type of voluntary behavior required to sustain a defense of assumption of the risk. The syllabus, however, merely holds that "[a]n employee does not voluntarily or unreasonably assume the risk of injury which occurs in the course of his or her employment when that risk *must be encountered in the normal performance of his or her job duties and responsibilities*." (Emphasis added.)

**{¶ 29}** Justice Herbert R. Brown's concurring opinion emphasized that the syllabus is not a departure from established law. Justice Brown further remarked that while there may be instances in which an employee may be forced to use a defective product in order to keep his or her job, there are also instances in which an employee simply elects to use the product without any compulsion from the employer. As to the latter, Justice Brown concluded that assumption of the risk was still a valid defense which could be asserted by a manufacturer. According to Justice Brown, the focus is on the voluntariness of the employee's behavior.

**{¶ 30}** We believe that Justice Brown's concurrence sets forth the applicable law. The majority in *Cremeans* did not relieve an employee from all responsibility for his or her own safety simply because he or she was at work. Therefore, we reject appellant's assertion that *Cremeans* abolishes the defense of assumption of the risk in all cases involving a work-related injury. However, we find that this defense is unavailable in those situations where the job duties require the employee to encounter the risk, and the employee is injured while engaging in normal job-related tasks.

**{¶ 31}** Accordingly, we hold that in a products liability case, assumption of the risk may be a viable defense against an employee injured by a defective product in the workplace. An employee will be deemed to have voluntarily exposed himself or herself to a risk when he or she has elected to use a defective product. However, the defense of assumption of the risk is not available when the employee is required to encounter the risk while performing normal job duties.

**{¶ 32}** Here, there is some question as to whether appellant voluntarily assumed the risk. Appellant's supervisor testified that although appellant had been trained in the procedures for adjusting the dies, and was aware that he needed first to pull the safety cord, or to use one of the other safety devices when adjusting a misaligned part, he failed to follow these procedures. However, there is also evidence that the press was dangerous because of the inability of the operator to see

someone in the die area. Appellant's experts averred that barrier guards which would have electrically interlocked in the inch mode would have eliminated the risk. This feature was available at the time the press was designed, and had been incorporated into other Verson Transmat presses. Additionally, appellant testified that his co-worker observed him working in the die space. Further, he did not anticipate that his co-worker would activate the press without being told to do so. Thus, there is a question as to whether appellant appreciated the full danger of the press. In light of this evidence, a reasonable jury could determine that appellant did not appreciate or voluntarily encounter the risk associated with the press.[5]

### III

{¶ 33} Finally, as to both the statutory and common-law claims, we are asked to decide whether summary judgment was appropriately entered. We find that it was not. Appellant presented evidence that it was foreseeable that two men would work on the press at the same time and that their hands would be engaged in the danger areas. Moreover, expert evidence revealed that if the press had been designed with barrier guards which would have electrically interlocked in the inch mode, the injury would have been prevented. Appellant also presented evidence that Whirlpool was never warned of this danger. Additionally, appellant's evidence revealed that the warning devices in place failed to provide the proper protection. The deposition testimony and affidavits revealed that the warning horn merely caused confusion because it was frequently activated and was similar sounding to other horns in the room. Additionally, the emergency stop buttons were not adequately accessible.

---

5. The doctrine of assumption of the risk also applies to appellant's negligent design claim. *Anderson v. Ceccardi* (1983), 6 Ohio St.3d 110, 6 OBR 170, 451 N.E.2d 780; R.C. 2315.19. However, as applied to this claim, the plaintiff's assumption of the risk is not a complete bar to recovery. Instead, it operates to reduce his recovery if the jury finds that the assumption of the risk amounted to fifty percent or less of the total responsibility for the injuries incurred. *Id.*

**{¶ 34}** Because questions of fact remain, we reverse the summary judgment and remand the cause to the trial court for a trial on the merits.

*Judgment reversed*

*and cause remanded.*

D<small>OUGLAS</small>, R<small>ESNICK</small>, P<small>FEIFER</small> and L<small>UNDBERG</small> S<small>TRATTON</small>, JJ., concur.

M<small>OYER</small>, C.J., and C<small>OOK</small>, J., dissent in part and concur in part.

———————————

**C<small>OOK</small>, J., dissenting in part and concurring in part.**

**{¶ 35}** Because I believe that the common-law cause of action of negligent design is abrogated by R.C. 2307.71 to R.C. 2307.80 ("the Products Liability Act"), I respectfully dissent. Furthermore, I concur with the majority's decision to adopt Justice Brown's concurrence in *Cremeans v. Willmar Henderson Mfg. Co.* (1991), 57 Ohio St.3d 145, 566 N.E.2d 1203, as the applicable law for employee assumption of the risk in the workplace, but cannot join its conclusion that Carrel did not assume the risk of his injury.

Negligent Design

**{¶ 36}** In concluding that a common-law cause of action of negligent design survives the enactment of the Products Liability Act, the majority applies the wrong rule of statutory construction. Applying *State ex rel. Morris v. Sullivan* (1909), 81 Ohio St. 79, 90 N.E. 146, paragraph three of the syllabus, the majority reasons that the Products Liability Act lacks "language clearly showing the intention to supersede the common law."

**{¶ 37}** Unlike the case before us today, *Morris* did not involve the codification of causes of action previously known at common law. Instead, *Morris* involved a statute that authorized the Governor to appoint a railroad commissioner "in January, 1909." During January of that year, however, the office of Governor changed hands. The outgoing Governor made the appointment, although the position filled would not become vacant until his term had expired. While the

language of the statute did not restrain the outgoing Governor from filling the impending vacancy, the common law prohibited premature appointments that would deny a successor his appointment prerogative. In holding that the common law survived the legislative enactment, the *Morris* court stated at paragraph three of its syllabus: "Statutes are to be read and construed in light of and with reference to the rules and principles of the common law in force at the time of their enactment, and in giving construction to a statute the legislature will not be presumed or held, to have intended a repeal of the settled rules of the common law unless the language employed by it clearly expresses or imports such intention."

**{¶ 38}** Unlike *Morris*, this case involves the codification of several common-law causes of action and not an enactment that is tangential to a rule of common law. The Act defines a "product liability claim" as "a claim that is asserted in a civil action and that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property other than the product in question * * *." R.C. 2307.71(M). The definition of "product liability claim" is sufficiently broad to include actions premised on the common-law theory of negligent design. The Act then makes all such causes of action "subject to" R.C. 2307.71 to 2307.80. R.C. 2307.72.

**{¶ 39}** In interpreting these provisions, the majority adopts the argument that the phrase "subject to" is not strong enough to abrogate unmentioned common-law theories. That conclusion, however, is based on the wrong rule of statutory construction (*Morris, supra*) and an incomplete reading of the Act.

**{¶ 40}** The proper rule is found at paragraph thirteen of the syllabus in *Bolles v. Toledo Trust Co.* (1944), 144 Ohio St. 195, 29 O.O. 376, 58 N.E.2d 381, overruled on other grounds, *Smyth v. Cleveland Trust Co.* (1961), 172 Ohio St. 489, 18 O.O.2d 42, 179 N.E.2d 60, paragraph two of the syllabus. Unlike *Morris*, the

*Bolles* rule relates specifically to an enactment that codifies the common law on a subject, stating:

"Where the General Assembly has codified the law on a subject, such statutory provisions are to govern to the exclusion of the prior non-statutory law *unless there is a clear legislative intention expressed or necessarily implied that the statutory provisions are merely cumulative."* (Emphasis added.)

{¶ 41} Accordingly, the majority misdirects its focus when it searches the Act for an explicit statement abolishing the common-law action of negligent design. Instead, the court should have determined whether the Act expressed or necessarily implied that it is merely cumulative to the common-law cause of action.

{¶ 42} The language of the Act neither provides a statement nor permits an inference that it is cumulative to common-law causes of action based on conduct falling within its ambit. In fact, a reading of R.C. 2307.72, 2307.73, 2307.75 and 2307.78 compels a contrary conclusion.

{¶ 43} R.C. 2307.73(A)(1) expressly limits liability against manufacturers for products liability claims to the theories of recovery set out in R.C. 2307.74 to R.C. 2307.77. R.C. 2307.72(D)(1) excludes claims related to pollution or contamination of the environment that exist at common law or by statute from operation of the Act. A similar exclusion is not provided for common-law negligent design claims. Moreover, the Act expressly imposes liability against suppliers based in negligence. R.C. 2307.78(A)(1). In light of the Act's inclusion of negligence as a viable theory of recovery in R.C. 2307.78, the absence of negligent design from R.C. 2307.75 is revealing.

{¶ 44} The majority also supports its conclusion with a stray inference that after this court's pronouncement in *McAuliffe v. W. States Import Co., Inc.* (1995), 72 Ohio St.3d 534, 651 N.E.2d 957, " 'it should now be understood that all common-law products liability causes of action survive the enactment of R.C. 2307.71 *et seq., * * * unless *specifically* covered by the Act because the Act * * *

14

falls short of creating a previously unavailable cause of action.' " (Emphasis *sic.*) Quoting *Byers v. Consol. Aluminum Corp.* (1995), 73 Ohio St.3d 51, 52, 652 N.E.2d 643, 644 (Douglas, J., dissenting). No legal authority is provided in the majority opinion or in either of the dissenting opinions that it cites to bridge the holding in *McAuliffe* to such a conclusion. Insertion of the proper law, in fact, provides a contrary result.

**{¶ 45}** The majority misunderstands *McAuliffe* when it states that "the majority implicitly recognized that the Products Liability Act did not supplant the common law applicable to products liability claims." The *McAuliffe* court was not called upon to decide whether the Products Liability Act supplanted common law. The issue before the court was much narrower. The *McAuliffe* court determined that a two-year statute of limitations for "bodily injury," rather than a six-year statute of limitations for "a liability created by statute," is appropriate for claims brought under the Act. In arriving at this conclusion, the court analyzed the Act as a codification of the common law of products liability. The court concluded that to the extent the Act modified products liability law, those modifications did not create a cause of action that would not have existed "but for" the statute. To say that the Act did not create causes of action unavailable at common law, however, does not foreclose a determination that the Act supplants those common-law theories. In fact, the *McAuliffe* court's treatment of the Act as a *codification* of products liability law provides further support for application of the rule of statutory construction set forth in *Bolles, supra,* and the ultimate conclusion that the common-law cause of action of negligent design has been abrogated by the Products Liability Act.

Assumption of the Risk

**{¶ 46}** I agree with the majority that Justice Brown's concurring opinion in *Cremeans, supra*, sets forth the applicable law for employee assumption of the risk in the workplace. Application of the defense should turn on whether the employee's behavior is voluntary or the result of employer compulsion. I disagree,

however, with the majority's conclusion that Carrel did not voluntarily assume the risk of his injury.

{¶ 47} Instead of focusing on whether Carrel's assumption of the risk was voluntary, the majority determines that a question remains as to whether Carrel "appreciated the full danger of the press." The majority supports its conclusion with a discussion of the allegedly defective nature of the press and an observation related to Carrel's belief that his co-worker would not activate the press unless instructed to do so. Neither is an appropriate consideration.

{¶ 48} The defense of assumption of the risk *assumes* a defective product; it shields a defendant from liability despite the fact that its product is defective. Accordingly, the majority's discussion of the product's defect is superfluous.

{¶ 49} Likewise, given that the issue is whether Carrel voluntarily assumed the risk or was compelled by the employer to encounter the risk, Carrel's subjective reliance on the care of his co-worker to refrain from cycling the press is not pertinent. The likelihood of co-worker error bears only on the extent of the risk—not Carrel's lack of volition or lack of knowledge of such risk.

{¶ 50} Carrel is an experienced press operator who was aware of the risk of injury if he placed his hand in the die space without taking precautions to prevent the press from cycling. Carrel knew that the press was equipped with a safety cord, stop buttons, and die safety blocks, all of which could have been used to prevent the press from cycling while his hands were in the die space. Carrel's employer instructed its press operators and die setters to pull the safety cord before placing their hands in the die space. Despite knowing that the machine's size prevented him from seeing the employee in charge of controlling the press and that the press's warning horn was difficult to distinguish from other machines' in the factory, Carrel bypassed the available safety precautions on an assumption that his co-worker would not activate the press. Carrel knew what could happen if his hand got caught in the die space while the press cycled. He also knew that if he failed to implement

any of the press's safety devices a co-worker could activate the press, causing it to cycle. Absent employer compulsion forcing Carrel to take such a risk, a factor that Carrel has not attempted to demonstrate, his assumption of the risk was voluntary.

### Conclusion

{¶ 51} Based on foregoing analysis, and the fact that I am not persuaded by any of the constitutional arguments advanced by Carrel, I would affirm the judgment of the court of appeals.

MOYER, C.J., concurs in the foregoing opinion.

_____