Edward L. CURTIS, et al., Plaintiffs,

v.

**HOOSIER RACING TIRE CORP., Defendant.**

No. 1:02CV2105.

United States District Court, N.D. Ohio, Eastern Division.

Jan. 13, 2004.

Stuart E. Scott, William Hawal, Spangenberg, Shibley & Liber, Cleveland, OH, for Edward L. Curtis, James E. Curtis, Plaintiffs.

Brent S. Silverman, Reminger & Reminger, Cleveland, OH, Frank Leonetti, III, Reminger & Reminger, Cleveland, OH, for Hoosier Racing Tire Corp., Defendant.

### MEMORANDUM & ORDER

O'MALLEY, District Judge.

Plaintiffs Edward and James Curtis, who are brothers living in Ohio, bring this action against defendant Hoosier Racing Tire Corp. ("Hoosier"), an Indiana corporation. The Curtises allege in their complaint that James owns a race car, which Edward was racing at the Talladega (Alabama) Super Speedway on October 14, 2000. The Curtises further allege that their race car was outfitted with tires designed and manufactured by Hoosier. When the right front tire blew out, the car slammed into the track wall, damaging the car and injuring Edward. The Curtises

assert the tire was defective and bring claims for strict product liability under Ohio law.

Hoosier moves for summary judgment on all claims (docket no. 23). For the reasons stated below, the motion is **DENIED**.

### I.

The parties have no serious dispute regarding the material facts in this case, although they disagree on how the law applies to those facts. The material facts are as follows.[1]

The Automobile Racing Club of America ("ARCA") is an organization that sanctions a stock car racing series, involving about 20 races each year at different race courses around the country. Drivers of the stock cars at these events reach speeds of 200 miles per hour or more, and the racers compete for prize money purses. One of the racing events included in the annual ARCA series is a race at the Talladega Speedway in Talladega, Alabama, usually held in October. The ARCA race at Talladega is a 300–mile/113–lap race; during the year 2000 series, the ARCA race at Talladega occurred on October 14.

The Curtis brothers have both been involved in car racing since they were 16 years old. Edward raced professionally in an effort to qualify for the Winston Cup Series. By the year 2000, Edward had participated in well over 100 car races, including over 20 ARCA series events. James had helped operate a race track, Thompson Drag Raceway, for the past fourteen years. Both were experienced race car drivers and owners, and were knowledgeable about the risks of serious

---

1. The Court's recitation of the facts is, for the most part, copied from Hoosier's brief. The Curtises did not seriously disagree with, or add to, Hoosier's statement of the facts. To the extent there was any dispute between the parties' versions of the facts, the Court views the evidence in a light most favorable to the Curtises.

injury, death, and property damage associated with race car driving.

The Curtises entered the 2000 ARCA race at Talladega, with Edward driving a stock car owned by his brother, James. All of the stock cars involved in the Talladega race (and, for that matter, all of the other ARCA-sanctioned races) were equipped with tires designed, manufactured, and sold by defendant Hoosier. Hoosier provided the tires to the racers pursuant to a "Tire Promotional Agreement" between Hoosier and ARCA. The Tire Promotional Agreement provided that Hoosier would supply all of the tires for ARCA events, and would contribute to a promotional fund administered by ARCA. In return, Hoosier was named as an Associate Series Sponsor and the "Official Tire" of ARCA for the 1998, 1999, and 2000 racing seasons.

Before the official start of the Talladega race, the drivers engaged in "practice laps" and "qualifying laps," the former to test their cars and the track, the latter to qualify for the race and earn their starting position. During the practice and qualifying laps, other drivers experienced sudden and unexpected tire blow-outs, sometimes resulting in crashes. Edward did not suffer a tire blow-out during his practice or qualifying laps, but he did not qualify for the race because of mechanical problems during the qualifying time trials. Nonetheless, Edward was added as a "provisional" driver before the race, in order to fill out the racing field. Edward started the Talladega race in the 40th position— the last position of the field.

During the 105th lap of the race, the right front tire on the race car suddenly suffered a blow-out. At the time, the tire had been on the car for a total of about 60 laps, and the blow-out was not caused by

an impact with anything on the track.[2] The blow-out caused Edward to lose control of his car and crash into a concrete wall. Edward's car did not hit the cars of any of the other drivers. The car was damaged and Edward suffered serious brain and head injuries.

As was standard operating procedure, both Edward and James signed two separate release agreements before their participation at the Talladega Speedway event. First, they both signed release agreements as part of their ARCA applications for the year 2000 (the "ARCA release"). Second, both signed a release agreement that was provided at Talladega Speedway on the day of the race (the "Talladega Release"). By signing the ARCA Release in early 2000, the Curtises both agreed, in pertinent part, that they

> RELEASE[D], WAIVE[D], DISCHARGE[D], AND COVENANT[ED] NOT TO SUE the promoter, participants, racing association, sanctioning organization or any subdivision thereof, track operator, officials, vehicle owners, drivers, pit crews, any persons in any restricted area, *promoters, sponsors, advertisers,* owners, and lessees of premises used to conduct the [ARCA] EVENT(S) and each of them, their officers and employees, all ... referred to [below] as "Releasees" ... from all liability to the Applicant ... for any and all loss or damage and any claim or demands therefore on account of injury to the person or property ... of the Applicant, whether caused by the negligence of the Releasees or otherwise while ... participating in the [ARCA] EVENT(S).

Motion exhibit C at 1 (emphasis added).

By signing the ARCA Release, the Curtises also: (1) "expressly acknowledge[d]

---

**2.** It is unclear whether this fact is disputed; the Court adopts the Curtises' version of the facts for the purpose of ruling on the pending motion.

and agree[d] that the activities at the [ARCA] EVENT(S) are very dangerous and involve the risk of serious injury and/or death and/or property damage;" (2) "ASSUME[D] FULL RESPONSIBILITY FOR AND RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE due to the negligence of the Releasees or otherwise ... while participating in the [ARCA] EVENT(S);" and (3) "expressly agree[d] that ... [the] release, waiver, and indemnity agreement is intended to be as broad and inclusive as is permitted by law." *Id.*

The Talladega Release included virtually identical language, setting out all of the same provisions. The Curtises agreed to all of these provisions again on October 14, 2000, when they arrived at the Talladega Speedway for the race.

Importantly, there is no dispute that Hoosier is a "promoter," "sponsor," and "advertiser," as those terms are used in the two Releases. The Tire Promotional Agreement between Hoosier and ARCA provided that Hoosier would be the exclusive supplier of racing tires for ARCA events. In exchange, ARCA named Hoosier an "ARCA Associate Series Sponsor," and designated the Hoosier tires as the "Official Tire" of ARCA. ARCA also agreed to place the Hoosier logo in all of its advertising, and to prominently display the Hoosier name and logo at all race track events. The Curtises had every reason to be aware, when they signed the releases, that the releases also ran in favor of Hoosier as a sponsor/advertiser.

Also important is the Curtises' concession that they do not bring any claim against Hoosier based on willful or wanton misconduct. In particular, Hoosier noted in its motion for summary judgment that the Curtises "do not allege any type of malicious, reckless, [or] intentional ... behavior on the part of Hoosier" and "do not allege willful or wanton misconduct." Motion at 13. Rather, Hoosier asserts, the Curtises "simply allege a products liability claim in the first count of the Complaint and a property damage claim in the second count." *Id.* The Curtises do not disagree with this characterization of their claims.

## II.

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law ....

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein .... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.,* 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

### III.

■ The essence of the argument between Hoosier and the Curtises may be distilled as follows. Hoosier insists that the Curtises "expressly assumed the risk of their injuries and contracted away their right to sue promoters and sponsors of ARCA events such as Hoosier." Motion at 13. The Curtises respond that "the express liability Release and Waivers signed by the Plaintiffs only contemplate negligence or other similar type conduct on the part of the Releasees but does not include within its scope claims for product liability which under Ohio law are premised upon strict liability without regard to the manufacturer's negligence." The Court concludes that the Curtises are correct.

■ Hoosier is certainly accurate when it states that, under Ohio law, a participant in a stock car race may agree by contract not to bring suit *for torts of negligence.* The Ohio Supreme Court has stated: "It has generally been held that a participant in a stock-car race and the proprietor of such activity are free to contract in such a manner so as to relieve the proprietor of responsibility to the participant for the proprietor's negligence, but not for the proprietor's willful or wanton misconduct." *Bowen v. Kil–Kare, Inc.,* 63 Ohio St.3d 84, 585 N.E.2d 384, 390 (1992). Thus, in *Seymour v. New Bremen Speedway, Inc.,* 31 Ohio App.2d 141, 287 N.E.2d 111 (1971), the court held that the plaintiff, who was severely burned during a car race, could

not recover against the race track owner because: (1) there was no evidence showing the defendant had engaged in a willful or wanton act; and (2) the plaintiff had signed a waiver and release.

For the same reasons, in *Toth v. Toledo Speedway*, 65 Ohio App.3d 166, 583 N.E.2d 357 (1989), the court held that spectators at a stock car race, who were hurt when a car crashed into the infield area, could not recover against the race track. *See also Guysinger v. K.C. Raceway, Inc.*, 54 Ohio App.3d 17, 560 N.E.2d 584 (1990) (same); *French v. Special Services, Inc.*, 107 Ohio App. 435, 159 N.E.2d 785, syllabus ¶ 1 (Ohio Ct.App.1958) ("[a] participant in a stock car race and the proprietor thereof are free to contract in such a manner as to relieve the latter from the responsibility for damages or injuries to the former caused by the latter's negligence, excepting when caused by willful or wanton misconduct"); *Clutter v. Karshner*, 2001 WL 1006155 at *1 (6th Cir. Aug.20, 2001) (affirming judgment against a plaintiff who broke his back during a car race because he had signed a release, "could not support his claims for wanton and willful misconduct," and did "not have a viable negligence claim"); *cf. Harsh v. Lorain Cty. Speedway, Inc.*, 111 Ohio App.3d 113, 675 N.E.2d 885 (1996) (denying race track defendant's motion for summary judgment, even though spectators had signed a release, because fact issue existed regarding whether defendant engaged in willful and wanton misconduct by failing to install recommended safety measures).

■ Hoosier is also generally accurate when it states that, under Ohio law, a participant in a stock car race may assume the risk of participation. In this case, the Curtises *expressly* (as opposed to impliedly) assumed the risk of injury during their participation: they signed a contract stating they knew their own activities carried "the risk of serious injury and/or death and/or property damage," and they agreed to "ASSUME[ ] FULL RESPONSIBILITY FOR AND RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE due to the negligence of the Releasees or otherwise." As the Supreme Court of Ohio has stated, "[e]xpress assumption of risk would arise where a person expressly contracts with another not to sue for any future injuries which may be caused by that person's negligence." *Anderson v. Ceccardi*, 6 Ohio St.3d 110, 451 N.E.2d 780, 783 (1983). The *Toth* court cited *Anderson* to support the proposition that, by signing a release like the one the Curtises signed, the plaintiff-spectators at a stock car race could not recover against the race track because they had expressly assumed the risk of injury. *Toth*, 583 N.E.2d at 360. But the *Toth* court was careful to limit its holding to express assumption of risk of injury caused by *negligence. Id.*

None of the cases cited by Hoosier (or the Curtises), however, involve claims for product liability. The wrinkle in this case is that the Curtises are not suing based on recklessness or negligence. Rather, the Curtises' claims are premised on strict liability, based on a defect in the design or manufacture of the tires produced by Hoosier. Strict liability, of course, is a very different theory than negligence. The question in this case thus becomes whether the Curtises, by signing the releases: (1) agreed not to sue Hoosier *for having provided a defective product,* and/or (2) assumed the risk *of being provided with a defective product.*

The Court's own research shows that the answer to this question is "NO"—the Curtises retain the right to sue Hoosier on a theory of having supplied a defective product, even after having signed their releases. The Court finds instructive the

case of *Mohney v. USA Hockey, Inc.*, 77 F.Supp.2d 859 (N.D.Ohio 1999), *affirmed in part and reversed in part*, 5 Fed.Appx. 450, 2001 WL 223852 (6th Cir.2001). In *Mohney,* the 17–year old plaintiff crashed into the boards during a hockey scrimmage and suffered a paralyzing injury. At the time of the crash, the plaintiff was wearing "a helmet manufactured by Bauer and a facemask produced by Karhu." *Id.* at 453–54. When the "helmet and faceguard crashed into the boards, a clip holding the faceguard broke off." *Id.* The *Mohney* plaintiff then sued: (1) the other skater involved in the crash; (2) the Amateur Hockey Association; (3) the Central States Hockey League; (4) the Toledo Cherokees amateur hockey team; (5) the manufacturer of Bauer Helmets and (6) the manufacturer of Karhu Facemasks.

Before the scrimmage, the *Mohney* plaintiff and his father had both signed a release, stating as follows:

> I/We understand and appreciate that participation or observation of the sport constitutes a risk to me/us of serious injury, including permanent paralysis or death. I/We voluntarily and knowingly recognize, accept, and assume this risk and release USA Hockey, its Affiliates, their sponsors, event organizers and officials from any liability therefore.

*Id.* The Sixth Circuit Court of Appeals, applying Ohio law, concluded that the release was valid as to the first four defendants, because: (1) there was no evidence that any of them engaged in willful or wanton misconduct; and (2) the plaintiff had assumed the risk of participating in the activity of playing hockey, which the "Ohio Supreme Court has recognized ... is a dangerous sport [where] '[i]njuries are a regular occurrence.'" *Id.* at 456–57 (quoting *Thompson v. McNeill,* 53 Ohio St.3d 102, 559 N.E.2d 705, 708 (1990)).

But the Sixth Circuit further found that the product liability claims against Bauer and Karhu were substantively different than the tort claims brought against the other defendants, and were not susceptible to summary judgment. The Sixth Circuit explained:

> The release at issue provides that participants "release USA Hockey, its Affiliates, their sponsors, event organizers and officials from liability therefore." Based on this language, the district court found that the 1994–95 release barred the Mohneys' claims against Bauer and Karhu, because they are "sponsors" of USA Hockey. We disagree. The release cannot *as a matter of law* preclude potential product liability claims against Bauer and Karhu *in their roles as manufacturers of the helmet and facemask, as distinguished from sponsors.* The plain language of the release does not preclude a player from bringing product liability claims against the manufacturers of any defective equipment.

*Id.* at 457–58 (emphasis added, footnote and citation omitted). Put simply, "the release did not reach the manufacturer defendants in their role as manufacturers." *Id.* at 458.

■ The *Mohney* ruling appears logical from the standpoint of public policy. While the *Mohney* plaintiff had reason to know about and accept the risks of injury inherent in playing hockey, he did not have reason to know of or accept the hazard that the helmet and faceguard he used to help *manage* his risk of injury was defective. Similarly, the Curtises had reason to know and assume the risk of injury during car-racing, even including the risk that a tire blow-out could cause a crash. But there is certainly a material dispute, at least, regarding whether the Curtises had reason to know that the tire, itself, was

unreasonably risky because it was defective. Indeed, under Hoosier's theory, a race-car product supplier could immunize itself from many product liability claims simply by doing what it probably already does—advertise at racing events. Further, under Hoosier's theory, it could have provided the Curtises and other drivers with a radically defective tire, one not designed even remotely for racing purposes, and, by virtue of Hoosier's advertising activities, have avoided any liability for injuries proximately caused.

Ultimately, the reasoning of *Mohney* applies equally to this case. The Curtises and Mohney both acknowledged that the sporting activity in which they were engaging was very dangerous, including risk of death. The Curtises and Mohney both agreed to assume this risk, and also not to sue the organizing authority or their "sponsors." Under Ohio law, however, such an agreement does not preclude claims of strict liability for defective manufacture or design of a product, as a matter of contract. To the extent the Curtises are suing Hoosier as a manufacturer of a defective product that caused them injury, rather than as a sponsor of an event during which they were injured, Hoosier is not entitled to summary judgment.

In addition to *Mohney,* the Court also takes notice of *Fee v. Brass Eagle, Inc.,* 2002 WL 1465762 (N.D.Ohio June 3, 2002). In *Fee,* the plaintiff accidentally shot himself in the eye with a paintball gun and sued the gun manufacturer. The *Fee* court examined the interplay, under Ohio law, of product liability claims and the defense of assumption of the risk. Reviewing the relevant case law, the court wrote:

> Plaintiffs also assert that defendant is precluded from raising assumption of the risk as a defense to [the product liability claim in] plaintiffs' complaint. While both parties agree that assump-

tion of the risk is a complete defense for a strictly liable defendant, *see* [*Bowling v. Heil Co.,* 31 Ohio St.3d 277, 511 N.E.2d 373 (1987) ], the parties disagree over the nature of the knowledge that [plaintiff] must have possessed in order to be deemed to have assumed the risk of injury resulting from the allegedly defective product.

> Defendant claims that to assume the risk [plaintiff] need only have known that an accidental discharge could have occurred and caused an injury. Plaintiff[ ] claim[s] that for [him] to have assumed the risk defendants must show he knew of the alleged defect in the paintball gun, and acted with full knowledge of the risk posed by that defect. In resolving this issue, I find plaintiffs' argument more persuasive.

> The Ohio Supreme Court has stated: For the defense of assumption of the risk to act as a bar to recovery of damages [in a products liability case], the defendant must establish that the plaintiff knew of the condition, that the condition was patently dangerous, and that the plaintiff voluntarily exposed himself or herself to the condition.

*Carrel v. Allied Prods. Corp.,* 78 Ohio St.3d 284, 290, 677 N.E.2d 795 (1997).

> Ohio appellate courts have elaborated, stating that in order for a plaintiff to assume the risk in a products liability case:

> "The user or consumer must discover the defect, be aware of the danger and proceed to unreasonably make use of the product." ... However, a plaintiff's negligent "failure to discover a defect in a product or to guard against the possibility of the existence of the defect" is not a defense.

*Westray v. Imperial Pools & Supplies, Inc.,* 133 Ohio App.3d 426, 432, 728 N.E.2d 431 (1999) (quoting *Sapp v.*

*Stoney Ridge Truck Tire,* 86 Ohio App.3d 85, 97, 619 N.E.2d 1172 (1993)) (citing R.C. § 2307.75(E)).

*Fee,* 2002 WL 1465762 at *1–2.

█ In other words, while assumption of the risk can be a complete defense to a product liability case, the defendant manufacturer/designer must show that the plaintiff knew of the precise product defect and the risks that defect carried. In this case, to prove the defense to the product liability claim of assumption of the risk by the Curtises, Hoosier would have to show that the Curtises knew that the tires were defective, and knew the risks of using those tires anyway. In fact, there is at least some evidence supporting both of these prongs: the Curtises certainly knew of the risks involved with a tire blowing out during a race, and there is some evidence that, during the practice and qualifying laps, the Curtises had seen other drivers experience sudden and unexpected Hoosier tire blow-outs, sometimes resulting in crashes. But Hoosier does not—and cannot—argue that, as a matter of law and undisputed fact, the Curtises assumed the risk of using a tire with known defects.[3] Hoosier argues only that the Curtises assumed the risk of injury generally by signing the release, and this argument is unavailing as against a product liability claim under Ohio law.

In sum, the Court concludes that Hoosier is not entitled to summary judgment on the Curtises' product liability claims, as a matter of law. Accordingly, the motion is denied.

**IT IS SO ORDERED.**

█

---

**3.** Of course, Hoosier does not need to rely on the defense of assumption of the risk at all; rather, it can simply prove that the tires were not defective. As such, there is no risk to assume.