WHITE et al., Appellants,

v.

DePUY, INC. et al., Appellees.

[Cite as *White v. DePuy, Inc.* (1998), 129 Ohio App.3d 472.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

No. CA98–01–008.

Decided Aug. 17, 1998.

474

*Wessel & Wessel, Robert F. Wessel* and *Richard J. Wessel,* for appellants, Gloria and Glen White.

*Porter, Wright, Morris & Arthur* and *Mark E. Elsener; Barnes & Thornburg* and *Kenneth H. Inskeep,* for appellee DePuy, Inc.

*Roetzel & Andress* and *June Smith Tyler,* for appellee Mercy Hospital Fairfield.

---

WALSH, Judge.

Plaintiffs-appellants, Gloria and Glen White ("the Whites"), appeal a decision of Butler County Court of Common Pleas denying their motion for summary

judgment against defendant-appellee DePuy, Inc. ("DePuy") and granting De-Puy's motion for summary judgment against the Whites. The Whites also appeal a separate decision by the trial court granting summary judgment to defendant-appellee Mercy Hospital of Fairfield, Ohio ("Mercy Fairfield"). We affirm in part, reverse in part, and remand.

On February 2, 1989, defendant, O. Daniel Fox, M.D., an orthopedic surgeon, performed hip replacement surgery on Gloria White. The prosthetic hip that Fox implanted into White was manufactured by DePuy. The hip is a ball and socket design. The socket component, or acetabulum, is made of metal lined with a polyethylene cup. In 1990, the type of polyethylene cup used in Gloria White's artificial hip was part of a voluntary recall issued by DePuy. DePuy's decision to recall those liners was "prompted by [DePuy's] * * * receipt of notices, primarily from surgeons, of twelve reported failures [of the polyethylene lining]." Because White's own liner was already implanted, it was not subject to the recall.

In June 1993, about three years after DePuy initiated the recall, Fox ordered x-rays of White's prosthetic hip. The x-rays showed that White's polyethylene cup liner had completely deteriorated, causing wear of the surrounding acetabulum. In June 1994, White had a second operation on her hip to replace the deteriorated components.

In April 1996, Gloria White and her husband, Glen White, filed this action against DePuy alleging that the polyethylene cup liner was a defective product. The complaint stated claims of (1) strict products liability for breach of express and implied warranties, and (2) negligent manufacture and sale of a defective product. Glen White sued for loss of consortium.

DePuy's attorneys took Fox's deposition testimony on October 9, 1996. In reviewing White's chart during that deposition, Fox realized that he had implanted mismatched hip replacement components into Gloria White. According to hospital records, Fox used a 32 mm ball with a 28 mm polyethylene-lined socket. Fox admitted during his deposition that this conduct falls below the acceptable standard of care for orthopedic surgeons. Ordinarily, according to Fox, the ball and socket should be the same size: "I would want a 28 head to go into a 28 socket." The Whites amended their complaint to add claims of medical negligence against both Fox and Mercy Fairfield, where White's first hip replacement was performed.

In September 1997, the Whites moved for summary judgment against Fox and DePuy, and DePuy filed a motion for summary judgment against the Whites. Mercy Fairfield also filed a motion for summary judgment. Following a hearing, the trial court denied the Whites' motion and granted DePuy's motion. In a separate judgment entry, the trial court granted the motion for summary

judgment filed by Mercy Fairfield. The Whites appeal, presenting the following assignments of error for review:

Assignment of Error No. 1:

"The trial court erred in denying summary judgment to plaintiffs-appellants against defendant-appellee, Depuy, Inc. and in granting defendant-appellee, Depuy, Inc., summary judgment against plaintiffs-appellants."

Assignment of Error No. 2:

"The trial court erred in granting summary judgment in favor of defendant-appellee Mercy Hospital Fairfield."

Under their first assignment of error, the Whites assert that they are entitled to summary judgment against DePuy because "[t]here are striking similarities in the problems reported to Defendant DePuy, Inc. and the description by Dr. Fox of the problems occurring in the cup liner inserted in Plaintiff, Gloria White." [1]

Summary judgment is appropriate when (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds construing the evidence in favor of the nonmoving party could reach but one conclusion and that conclusion is adverse to the non-moving party. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 146, 524 N.E.2d 881, 883–884; Civ.R. 56(C). The burden of showing that no genuine issue of material fact exists falls on the party moving for summary judgment. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 294, 662 N.E.2d 264, 274–275; *Shaffer v. Fite* (1993), 90 Ohio App.3d 373, 375, 629 N.E.2d 483, 484–485. To avoid summary judgment, the nonmoving party must "set forth specific facts which demonstrate that there is a genuine issue of material fact for trial." Civ.R. 56(E); *Albritton v. Neighborhood Centers Assn.* (1984), 12 Ohio St.3d 210, 211, 12 OBR 295, 295–296, 466 N.E.2d 867, 868–869; *Schlack v. CSX Transp.* (Feb. 5, 1996), Warren App. No. CA95–09–092, unreported, at 4, 1996 WL 42333. Doubts must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358–359, 604 N.E.2d 138, 139–140.

Our standard of review for summary judgment is the same as that of the trial court. We review cases *de novo*. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153, 1157–1158, citing *Midwest Specialties, Inc. v. Firestone Co.* (1988), 42 Ohio App.3d 6, 8, 536 N.E.2d 411,

---

1. The Whites also assert that they are entitled to summary judgment against Fox. However, in accordance with Civ.R. 54(B), the lower court did not rule on the Whites' motion for summary judgment against Fox, but entered final judgment only "on the issue of liability against Defendant DePuy" after expressly determining that that there is no just reason for delay. With no decision by the trial court concerning Fox before us, we have nothing to review and, therefore, do not address this issue.

413–414.  In applying the *de novo* standard, we review the trial court's decision independently and without deference to the trial court's determination.  *Id.*  We also follow the standards set forth in Civ.R. 56(C).  See *Wilhelm v. Heritage Mgt. Co.* (Jan. 26, 1988), Butler App. No. CA97–07–144, unreported, at 3, 1998 WL 24342, quoting *Saunders v. McFaul* (1990), 71 Ohio App.3d 46, 50, 593 N.E.2d 24, 26 (" 'The reviewing court evaluates the record * * * in a light most favorable to the nonmoving party.  * * * The motion must be overruled if reasonable minds could find for the party opposing the motion.' ").

■  The Whites' claims against DePuy sound in products liability and, therefore, are covered by Ohio's Products Liability Act, which is codified at R.C. 2307.71 to 2307.80 and applies to "[a]ny recovery of compensatory damages based on a product liability claim."  R.C. 2307.72(A).[2]  A "product liability claim" is defined to include (1) civil claims to recover compensatory damages from a manufacturer for physical injury to a person that "allegedly arose from * * * [t]he design, formulation, production, construction, creation, assembly, rebuilding, testing or marketing of that product," and (2) claims that a product is defective because it fails to "conform to any relevant representation."  R.C. 2307.71(M). Such claims must allege other than economic damages.  *LaPuma v. Collinwood Concrete* (1996), 75 Ohio St.3d 64, 661 N.E.2d 714, syllabus;  R.C. 2307.71(M). We now address the claims brought by the Whites against DePuy.

I.  Breach of Implied Warranty

■  Under this claim, the Whites allege that DePuy has breached its implied warranty that the liner is "free of all defects and safe for its intended use."  "Implied warranty in tort" is a common-law cause of action that imposes liability upon a manufacturer or a seller for breach of an implied representation that a product is "of good and merchantable quality, fit and safe for its ordinary intended use * * *."  See 76 Ohio Jurisprudence (1987) 470, Products Liability, Section 39.  An action for breach of implied warranty in tort is considered "virtually indistinguishable" from an action for strict liability in tort as described in Section 402A of the Restatement of Torts 2d.  See *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 322, 4 O.O.3d 466, 469, 364 N.E.2d 267, 271 ("Because there are virtually no distinctions between Ohio's 'implied warranty in tort' theory and the Restatement version of strict liability in tort, [fn. deleted] and because the Restatement formulation * * * greatly facilitates analysis in this area, we hereby approve Section 402A of the Restatement of Torts 2d").  Since *Temple,* the two theories have been "used interchangeably and analyzed togeth-

---

2.  In their briefs on appeal, neither the Whites nor DePuy applied Ohio's Products Liability Act to the Whites' claims.  The court thereafter ordered both parties to submit supplemental briefs addressing the application of the statute to the Whites' claims.

er." *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.* (1989), 42 Ohio St.3d 40, 46, 537 N.E.2d 624, 632.

The first issue we must address under this assignment of error is what law applies to the Whites' claim. Following the enactment of the Ohio's products liability law in 1988, some courts have found that where personal injury is alleged, the common-law cause of action for implied warranty in tort has been preempted by the products liability statute. See, *e.g., Barrett v. Waco Internatl., Inc.* (1997), 123 Ohio App.3d 1, 10, 702 N.E.2d 1216, 1222, citing *LaPuma,* 75 Ohio St.3d 64, 661 N.E.2d 714 ("the Ohio product liability statutes preempt warranty claims concerning products which seek damages for bodily injury"). Accord *Nadel v. Burger King* (1997), 119 Ohio App.3d 578, 586, 695 N.E.2d 1185, 1190, also citing *LaPuma* (personal injuries caused by a product's failure to conform due to a defect is governed solely by products liability law).

Having read *LaPuma,* we find that it arguably implies that common-law products liability claims that have been codified are "preempted" by the statute. *Id.* at 66, 661 N.E.2d at 715 ("We find that since appellants' claim is not a product liability claim pursuant to statute, R.C. 2307.71 to 2307.80 do not preempt their cause of action"). However, *LaPuma* holds that a cause of action is not a product liability claim under Ohio's product liability law unless it alleges damages other than economic damages, and that a failure to allege other than economic damages does not destroy the claim but removes it from the purview of the act. *LaPuma* does *not* squarely address the issue of whether the theory of implied warranty has been preempted where other than economic damages are alleged.

Furthermore, since *LaPuma* was decided, the Ohio Supreme Court has had the opportunity to consider whether the products liability statute "abrogates" common-law causes of action for products liability. See *Carrel v. Allied Products Corp.* (1997), 78 Ohio St.3d 284, 677 N.E.2d 795. In *Carrel,* the court held that the common-law cause of action for negligent design "survives the enactment of the Ohio Products Liability Act" even though the act does not specifically mention negligent design. *Id.* at paragraph one of the syllabus. The broader implication of this holding—and the clear message of *Carrel*—is that the products liability act is not the exclusive basis for tort-based product liability claims. *Id.* 78 Ohio St.3d at 289, 677 N.E.2d at 799–800. "[I]n the absence of language clearly showing the intention to supersede the common law, the existing common law is not affected by the statute, but continues in full force. * * * There is no repeal of the common law by mere implication." *Id.* at 287, 677 N.E.2d at 798–799.

The court in *Carrel* also cites with approval the following statement:

"[I]t should now be understood that all common-law products liability causes of action survive the enactment of * * * the Ohio Products Liability Act, unless

*specifically* covered by the Act because the Act * * * 'falls short of creating a previously unavailable cause of action * * * .' " (Emphasis *sic.*) *Carrel* at 289, 677 N.E.2d at 800, quoting *Byers v. Consol. Aluminum Corp.* (1995), 73 Ohio St.3d 51, 52, 652 N.E.2d 643, 644 (Douglas, J., dissenting). See, also, *Curtis v. Square–D Co.* (1995), 73 Ohio St.3d 79, 652 N.E.2d 664 (Douglas, J., dissenting).

We make special note of the fact, that in reaching its conclusion, the court expressly rejected arguments that R.C. 2307.72(A) ("Any recovery of compensatory damages based on a product liability claim is subject to [the products liability act]") and R.C. 2307.73(A) ("A manufacturer is subject to liability for compensatory damages * * * only if the claimant establishes [certain statutorily defined products liability claims]") are clear expressions by the Ohio General Assembly that all products liability claims must be brought under the Products Liability Act.

■    With the foregoing in mind, we now address the question of whether the common-law cause of action of implied warranty in tort survives the enactment of the products liability act. We have found no language in the statute showing an express intent by the legislature to abrogate this common-law theory as a cause of action. Thus, the remaining question is whether the common-law theory of implied warranty is "specifically covered" by R.C. 2307.71 *et seq.*, so that it does not survive the enactment of the statute. We answer this question in the negative.

■    R.C. 2307.74 describes a statutory cause of action for a product "defective in manufacture and construction" which has common elements with the common-law implied warranty/strict tort liability cause of action. At common law, the elements of an action based on strict liability in tort, and thus for breach of implied warranty, are:

" '(1) [the existence of] a defect in the product manufactured and sold by the defendant;

" '(2) such defect existed at the time the product left the hands of the defendant; and

" '(3) the defect was the direct and proximate cause of the plaintiff's injuries.' " *Temple,* 50 Ohio St.2d at 321, 4 O.O.3d at 468, 364 N.E.2d at 270, quoting *State Auto Mut. Ins. Co. v. Chrysler Corp.* (1973), 36 Ohio St.2d 151, 156, 65 O.O.2d 374, 377, 304 N.E.2d 891, 895.

■    A defect is considered to exist in a product that is not " 'of good and merchantable quality, fit and safe for * * * [its] ordinary intended use.' " *Temple,* at 321, 4 O.O.3d at 468, 364 N.E.2d at 270, quoting *Lonzrick v. Republic Steel Corp.* (1966), 6 Ohio St.2d 227, 235, 35 O.O.2d 404, 409, 218 N.E.2d 185, 191.

Defects in products may be proven by direct or circumstantial evidence. *State Farm Fire & Cas. Co. v. Chrysler Corp.* (1988), 37 Ohio St.3d 1, 6, 523 N.E.2d 489, 493. "Where direct evidence is unavailable, a defect in a manufactured product existing at the time the product left the manufacturer may be proven by circumstantial evidence where a preponderance of that evidence establishes that the loss was caused by a defect and not other possibilities, although not all other possibilities need be eliminated." *Id.*

By comparison, under R.C. 2307.74 a product is defective in manufacture or construction if:

"(1) when it left the control of its manufacturer,

"(2) it deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards." R.C. 2307.74.

In addition, a product may be defective in manufacture and construction even though the manufacturer exercised all possible care. *Id.*

Despite the common elements of these two causes of action, we find that the statute does not supplant the common-law theory. The legislature did not expressly do so. In addition, critical distinctions exist between the two theories, not the least of which is an additional burden that the statute places upon plaintiffs to show that a product deviates from "design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units." Accordingly, we find that the common-law cause of action of implied warranty in tort continues to exist even after the enactment of the Ohio Products Liability Act in 1988.

■ Returning to our analysis of the Whites' claims in this case, we find that there is no evidence in the record to support the statutory claim under R.C. 2307.74. In particular, there is no evidence concerning "design specifications, formula, or performance standards of the manufacturer" or of any failure by DePuy to meet them. Therefore, we find that summary judgment was properly granted on this claim.

It is also apparent from the complaint that the Whites pled a common-law cause of action for implied warranty. We now address the merits of that claim.

In support of their motion for summary judgment, the Whites rely almost entirely on the deposition testimony of Fox and the announcement by DePuy recalling defective liners. In his deposition taken on October 9, 1996, Fox testified about the events preceding Gloria White's second hip replacement. Gloria White first complained of pain from her artificial hip in October 1992,

nearly three years after her first hip replacement. An x-ray taken at that time revealed a "loss of centricity" of the femoral head within the plastic socket, suggesting that "there was wear occurring in the socket itself." In later visits, Gloria White complained of pain, but Fox concluded that she was having "pain of a muscular origin." In June 1994, after talking with Glen White, Fox learned that Gloria White was experiencing popping and cracking in her hip, and her hip was "slipping in and out." Subsequent x-rays showed a "tremendous, tremendous change * * * where there was almost total loss of polyethylene thickness in the lateral portion of the acetabular polyethylene liner and metal was contacting metal apparently and it even looked like the metal likely dislocated partially or cut through some of the metal— * * * out of the socket." In Fox's opinion, this situation "demanded" a second operation on White's hip.

During the second surgery, Fox found a "crankcase-type fluid" in the joint that indicates "metal on metal wear." To Fox, the presence of this fluid suggested that "most likely the ball was actually now not rubbing against the liner any more but instead rubbing against the metal shaft[.]"

When asked about the deterioration in White's prosthesis, Fox testified that wear in a hip replacement component is "inevitable," and that acetabular wear is a "documented phenomenon." According to Fox, hip prostheses ordinarily have a wear pattern of one or two millimeters per year. While they are designed to last ten years, "some [hips] wear faster than others." For instance, replacement hips in active young people tend to wear faster than those in more sedate older people.

In a second deposition taken on July 30, 1997, Fox listed some of the factors that contribute to acetabular wear. These include (1) age, (2) "the mechanics of the polyethylene," (3) the continuity and consistency of the polyethylene, (4) the "mechanical design of the implant," (5) a mismatch between ball and socket, and (6) "less than perfect spherical contact." In Gloria White's case, Fox concluded that there were "several factors working against her" that would encourage more rapid deterioration, including (1) "her young age and expected higher activity level," (2) the mismatched ball and socket, (3) the relatively small size of the socket used in White's replacement ("there was a lot less room to have polyethylene in there"), (4) her specific initial ailment, which was diagnosed as polymyositis, (5) a prior infection of her hip region which made her a "compromised host," and (6) the possibility of a defective polyethylene liner. Fox admitted, however, that he is not an expert in the failure analysis of hip prostheses. Instead, he is an orthopedic surgeon who has some "basic information and knowledge" of why a replacement hip would fail.

The worn liner removed from White was, apparently, misplaced or discarded by Fox, and is thus unavailable for inspection. Fox testified that during White's

revision surgery, he observed that "[White's] socket had a deficient portion. The polyethylene was worn and was split." A metal rim or marker around the polyethylene was also split and part of that was completely worn away. "The metal ball had gone into the lateral side of the metal socket and worn into that to a degree almost to the point where it was through and through the socket."

Fox also described the condition of the prosthesis after he removed it from Gloria White:

"[T]he polyethylene liner * * * was split * * * had a wear trough across it, so instead of having a spherical base it had an oblong base. * * * Through and through, through the side, going right through the side of the thing. So there was a trough running through the side of the acetabulum. It wasn't a spherical wear and it was central wear as well as lateral wear. * * * [T]he way it looked is that it was beyond what I could account for just with normal wear and tear. It was not normal to see this. In retrospect, at this point knowing the mismatched size femoral head and socket, that contributed somewhat to the wear pattern, but in retrospect also the polyethylene problem that occurred with DePuy implants was at that time, my feelings were, it was the cause of the excessive wear. * * * Not the wear of a mismatch. * * * And my conclusions were that the failed defective implant was the cause of it, the excessive wear. The defective polyethylene was the cause of excessive wear.

" * * * *

"[T]he polyethylene wear pattern was not a normal wear pattern. It happened too rapidly, and it happened eccentrically * * *. [F]rom my standpoint it was beyond what would have been expected in a 45 or 42 or 40–year–old–hip that was five years since its inception. Based on * * * my knowledge that there was some information about the defectiveness, the defective sockets, plastic polyethylene bearings that had been alluded to by the detail people or representatives of DePuy and published in the meetings * * *. I concluded that the polyethylene was the source of this at the time of the surgery. Subsequent to that, having seen at this point that there was a mismatch in size, there was a combination of factors. If there hadn't been a defective polyethylene, would it have worn as quickly? I don't know that there's a way of answering that. My knowledge of it is such that this lasted for two years before it showed any signs of wear, okay, despite the mismatch in size."

By comparison, the March 9, 1990 recall announcement issued by DePuy states that the failure of the defective liners appears as a "breaking of the polyethylene liner immediately beneath the rim/body interface in the superior position of the implanted cup." The letter further states that "[a]fter failure, the polyethylene shell may rotate inward * * * exposing the metal of the acetabular cup shell to the metal ball on the femoral stem."

In considering the Whites' motion for summary judgment against De-Puy, we must view the evidence supporting their motion in the light most favorable to the nonmoving party. Civ.R. 56(C). The evidence before us indicates that there may be a number of reasons for the wear pattern of Gloria White's original polyethylene liner unrelated to a possible defect in the liner itself. Therefore, we find that reasonable minds could disagree as to whether the liner was defective, whether the defect existed when the liner left DePuy's control, and whether its relatively rapid deterioration was result of the defect. Accordingly, we affirm the judgment of the trial court denying the motion for summary judgment filed by Gloria and Glen White.

As for DePuy's motion for summary judgment against the Whites, we find that it should not have been granted as to the common-law claim of strict liability. The same issues of material fact that preclude summary judgment for the Whites also require us to deny summary judgment to DePuy. In reviewing DePuy's motion for summary judgment we are bound to view the evidence in the light most favorable to the Whites. In addition, we reiterate that "the party seeking summary judgment ' * * * bears the burden of affirmatively demonstrating that, with respect to every essential issue of each count in the complaint, there is no genuine issue of fact.' " *Dresher v. Burt*, 75 Ohio St.3d at 294, 662 N.E.2d at 274. DePuy has not met this burden. To the contrary, we find that the evidence raises a question of material fact concerning whether there was a defect in the liner. In addition, reasonable minds could agree that such a defect would be of the type that could arise only in the manufacturing process, see *State Farm*, 37 Ohio St.3d at 9–10, 523 N.E.2d at 496–497, that the liner was manufactured and sold by DePuy, and that the liner proximately caused harm to Gloria White.

In summary, with respect to this assignment of error, we affirm the trial court's denial of the Whites' motion for summary judgment against DePuy, and we reverse the trial court's decision to grant summary judgment for DePuy limited to the common-law claim of strict liability in tort.

II. Breach of Express Warranty

Under the Products Liability Act, a product is defective if it "did not conform, when it left the control of its manufacturer, to a representation made by that manufacturer." R.C. 2307.77. "Representation" is defined as an "*express* representation of a material fact concerning the character, quality, or safety of a product." (Emphasis added.) R.C. 2307.71(N). A plaintiff seeking to recover under R.C. 2307.77 must show:

" '(1) that the manufacturer made a representation as to a material fact concerning the character or quality of the manufacturer's product;

" '(2) that the product did not conform to that representation;

" '(3) that the plaintiff justifiably relied on that representation; and

" '(4) that the plaintiff's reliance on the representation was the direct and proximate cause of the plaintiff's injuries.' " *Chic Promotion, Inc. v. Middletown Security Sys., Inc.* (1996), 116 Ohio App.3d 363, 366–367, 688 N.E.2d 278, 281, quoting *Gawloski v. Miller Brewing Co.* (1994), 96 Ohio App.3d 160, 165, 644 N.E.2d 731, 734.

The common law of breach of express warranty was codified at R.C. 2307.77, which states:

"A product is defective if it did not conform, when it left the control of its manufacturer, to a representation made by that manufacturer. A product may be defective because it did not conform to a representation even though its manufacturer did not act fraudulently, recklessly, or negligently in making the representation."

▮ We find no evidence in the record to support an action either for the common-law or the statutory form of this claim. Specifically, we have not found—and the Whites do not identify—any evidence of an express representation made by the manufacturer. Where there is no representation, there can be neither failure to conform by the manufacturer, nor reliance by the plaintiff. Accordingly, we find that summary judgment on this issue was properly granted to DePuy.

III. Negligence

▮ To recover in an action for products liability based in negligence, a plaintiff must show that "the defendant owed him a duty, that the duty was breached and that the injury proximately resulted from the breach." *Freas v. Prater* (1991), 60 Ohio St.3d 6, 9, 573 N.E.2d 27, 30, citing, *inter alia, Jeffers v. Olexo* (1989), 43 Ohio St.3d 140, 539 N.E.2d 614. In a negligence context, proximate cause is shown when the injury sustained is shown to be "the natural and probable consequence of the negligence alleged." *Id.* at 143, 539 N.E.2d at 617.

Applying this standard to the facts in the record, we conclude that appellant has failed to identify genuine issues of material fact concerning DePuy's alleged negligence in manufacturing and selling the replacement hip. There is no evidence in the record concerning either of these claims. Accordingly, as to the claims of negligent manufacture and sale, we affirm the trial court.

▮ In their second assignment of error, the Whites contend that the trial court erred by granting summary judgment to Mercy Fairfield. The Whites argue that the record is sufficient to "establish liability on the part of Mercy Hospital." Specifically, the Whites state that no employee of Mercy Fairfield

informed Fox that he was implanting different-sized prosthetic components into Gloria White. The Whites suggest that Fox should have been informed of the mismatch by at least one of the following individuals: (1) the person who affixed to Gloria White's chart the adhesive labels taken from the boxes of hip replacement parts, (2) the person who listed the catalog numbers of the component parts used on the document titled "Operating Room Nurse Record," or (3) Chris Smith, a registered nurse employed by Mercy Fairfield, who attended Gloria White's first hip replacement surgery.

"Under the doctrine of respondeat superior, a hospital is liable for the negligent acts of its employees." *Berdyck v. Shinde* (1993), 66 Ohio St.3d 573, 578, 613 N.E.2d 1014, 1020. To show that a hospital employee was negligent in an action involving conduct within the common knowledge and experience of jurors, a plaintiff must demonstrate that the employee owed a duty of care to the plaintiff, that the employee breached that duty, and that the breach proximately caused the plaintiff's injuries. *Id.; Ramage v. Cent. Ohio Emergency. Serv. Inc.* (1992), 64 Ohio St.3d 97, 103, 592 N.E.2d 828, 833–834. However, when the professional skills and judgment of a nurse are alleged to be deficient, "expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patient's injury." *Id.* at paragraph one of the syllabus. Here plaintiffs argue, in essence, that the hospital employees were negligent because they exercised poor judgment. We find that the negligence action filed by the Whites concerns matters involving the professional skill and judgment of the nurses employed by Mercy Fairfield. In reaching this conclusion, we observe that plaintiffs appear to agree; the complaint filed against Mercy Fairfield clearly states a cause of action for medical, as opposed to ordinary, negligence. See *Katz v. Mt. Sinai Med. Ctr.* (May 7, 1998), Cuyahoga App. No. 72608, unreported, 1998 WL 229506.

We begin by observing that there is no expert testimony in the record concerning the prevailing standard of care. The absence of this essential testimony is fatal to the Whites' prima facie case of medical negligence. Although the record contains an affidavit by Chris Smith which sets forth her understanding of the steps to be "followed during a hip replacement," it is insufficient to qualify as the requisite expert testimony. Smith has not been qualified as an expert, and Smith's affidavit does not indicate how the protocol she describes relates, if at all, to the standard of care in the nursing profession. In addition, even if there were expert testimony in record concerning the standard of care for nurses, there is no evidence concerning the conduct of the nurses during Gloria White's hip replacement surgery, *i.e.*, whether they breached the standard of care. The testimony of Fox suggests that they did not:

Although Fox could not recall the specifics of how the components parts were selected during White's surgery, he testified that generally his privately employed surgical assistant would "be the one to check the individual implants before they were handed to me and before I put them in the person."

Thus, viewing the evidence as Civ.R. 56(C) requires, we find that the Whites have failed to meet their burden of proof. See *Dresher*, 75 Ohio St.3d at 293, 662 N.E.2d at 273–274. Summary judgment was properly granted to Mercy Fairfield. The second assignment of error is overruled.

In summary, we affirm the trial court's decision denying the Whites' motion for summary judgment. We also affirm, in part, the trial court's decision granting DePuy's motion for summary judgment. We reverse the trial court insofar as it granted summary judgment to DePuy on the common-law claim of implied warranty/strict liability in tort. Finally, we affirm the trial court's decision to grant summary judgment to Mercy Fairfield. Accordingly, the judgments are affirmed in part, reversed in part, and the cause is remanded.

*Judgments affirmed in part,*
*reversed in part*
*and cause remanded.*

KOEHLER, J., concurs.

POWELL, P.J., concurs in part and dissents in part.

POWELL, Presiding Judge, concurring in part and dissenting in part.

I concur with the majority's opinion to overrule the Whites' second assignment of error and affirm the trial court's decision granting summary judgment to Mercy Fairfield. However, I respectfully dissent from the portion of the majority's opinion that reverses the trial court's decision granting summary judgment to DePuy, and I concur in judgment only with the portion of the majority's opinion that affirms the trial court's decision denying the Whites' motion for summary judgment.

As noted in the majority opinion, common-law claims for implied warranty/strict tort liability require a plaintiff to establish that a defect was the direct and proximate cause of the plaintiff's injuries or loss. The majority finds that summary judgment for DePuy was precluded because issues of material fact exist regarding whether the prosthetic hip manufactured by DePuy was a defective product that proximately caused White's injury. Specifically, the majority finds that an issue of fact arises from Fox's testimony and a recall announcement by

DePuy as to whether the polyethylene cup liner of the hip was a defect that proximately caused White's injuries. I disagree.

The recall announcement and Fox's deposition are insufficient to raise a question of material fact as to whether the polyethylene cup liner was a defect that proximately caused Gloria White's injuries. Although the recall announcement by DePuy may be evidence of a defect, it does not support a finding that a particular defect proximately caused White's injury. See *State Farm Fire & Cas. v. Chrysler Corp.* (1988), 37 Ohio St.3d 1, 6–7, 523 N.E.2d 489, 493–495 Moreover, since someone threw the prosthesis hip away and since Fox acknowledges that he is not an expert in analyzing the failure of hip prostheses, Fox's testimony is insufficient to support a finding that the polyethylene cup liner of the hip was a defect that proximately caused White's injury. Therefore, since the Whites failed to present expert testimony or other evidence that demonstrates a genuine issue of material fact as to whether a particular defect proximately caused Gloria White's injury, the trial court properly granted summary judgment in favor of DePuy. See *id.* at 8, 523 N.E.2d at 495–496.

The Supreme Court of Ohio has held that the common-law cause of action for negligent design "survives the enactment of the Ohio Products Liability Act" even though the act does not specifically mention negligent design. *Carrel v. Allied Products Corp.* (1997), 78 Ohio St.3d 284, 677 N.E.2d 795, paragraph one of the syllabus. Based upon this holding, the majority opinion in the present case finds that "the common-law cause of action of implied warranty in tort continues to exist even after the enactment of the Ohio Products Liability Act in 1988." However, I believe, as outlined in Justice Cook's persuasive dissent in *Carrel*, that the Whites' claims for personal injuries allegedly caused by a defective product are exclusively governed by Ohio's products liability act. See *Nadel v. Burger King* (1997), 119 Ohio App.3d 578, 585, 695 N.E.2d 1185, 1189–1190; *Barrett v. Waco Internatl., Inc.* (1997), 123 Ohio App.3d 1, 702 N.E.2d 1216. Therefore, I concur in judgment only with the portion of the majority's opinion that affirms the trial court's decision denying the Whites' motion for summary judgment.