OPINION
{¶ 1} Plaintiff-appellant, Air-Ride, Inc., appeals a decision from the Clinton County Court of Common Pleas granting partial summary judgment in favor of defendant-appellee, DHL Express, Inc. We affirm.
 {¶ 2} In 1994, Air-Ride began providing commercial trucking services for ABX Air, *Page 2 
Inc., a subsidiary of Airborne Express, pursuant to a written agreement. The agreement was renewed with three-year terms in 1996, 1999, 2002 and 2005. ABX provided shipping services for DHL. Under the agreement, Air-Ride transported packages over specific routes, for specific negotiated rates, from one package sorting facility to another, referred to as "hub-to-hub," or between a hub and a local delivery station, "hub-to-station." Pursuant to the agreement, Air-Ride also provided hub management services to oversee its line-haul operations at four hubs.
 {¶ 3} In August 2003, DHL purchased Airborne Express and ABX became a separate public company with DHL as its sole customer. DHL and ABX entered into a contract for ABX to manage the line-haul operations.
 {¶ 4} In August 2005, Air-Ride and ABX negotiated a renewal of the three-year agreement. DHL also actively participated in the negotiations to determine proposed price increases. In early 2006, DHL decided to begin directly managing its line-haul operations. As permitted by the agreement, DHL terminated its arrangement with ABX and took assignment of ABX's contracts with the various carriers hauling DHL freight. DHL informed Air-Ride of the assignment via written notification on March 20, 2006, assuring that "DHL would like to continue the business" with Air-Ride and continue to honor the "line haul rates and fuel surcharge program." Air-Ride acknowledged the assignment on March 27, 2006.
 {¶ 5} Shortly thereafter, DHL decided to further consolidate their operations by "re-engineering the schedule, reducing the number of trucks, and reducing the number of carriers." To accomplish this objective, DHL contacted Air-Ride, and its other carriers, to solicit bids for the lanes in its network. DHL invited Air-Ride to a meeting scheduled for April 13, 2006 to solicit bids for its lanes of traffic. Air-Ride alleges that at the meeting DHL announced that it intended to re-bid all of its hub-to-hub lanes, including those that Air-Ride had under the current agreement. To prevent losing all business with DHL, Air-Ride *Page 3 
participated in the re-bidding process, but also informed DHL that it was not waiving its rights under the agreement. Air-Ride was awarded substantially less routes as a result, losing an estimated nine million dollars in yearly revenue.
 {¶ 6} On April 28, 2006, Air-Ride sent a letter to DHL warning that DHL was violating the agreement by terminating the hub-to-hub business. Air-Ride urged that DHL was breaking the promise made only weeks earlier to continue business with Air-Ride by honoring the "line haul rates and fuel surcharge program." On June 2, 2006, Air-Ride filed its original complaint in this case and moved for a temporary restraining order. The trial court declined to issue the restraining order or a preliminary injunction. DHL began implementing its revised operations.
 {¶ 7} DHL moved for dismissal. The trial court granted DHL's motion to dismiss, finding that Section 3.01(B)(2) of the agreement expressly authorized the action taken by DHL. Air-Ride appealed to this court. This court reversed and remanded the decision to the trial court.Air Ride, Inc. v. DHL Express (USA), Inc. (Feb. 20, 2007), Clinton App. No. CA2006-08-027, accelerated calendar judgment entry.
 {¶ 8} On March 2, 2007, DHL informed Air-Ride that it no longer required Air-Ride to provide the hub management services. On remand, Air-Ride filed its first amended complaint. Thereafter, on June 1, 2007, DHL sent Air-Ride notice that it was terminating the entire agreement between the parties pursuant to Section 2.01 of the contract, eliminating Air-Ride's remaining hub-to-hub and hub-to-station routes. Air-Ride then submitted its second amended complaint, alleging breach of multiple sections of the contract, breach of the duty of good faith and fair dealing, fraud, and tortious interference. DHL and Air-Ride filed opposing motions for summary judgment. The trial court granted summary judgment in favor of DHL on the basis of Section 3.01(B)(2), Section 2.01, and Section 1.27 of the contract. *Page 4 
 {¶ 9} Air-Ride timely appeals, raising three assignments of error. Each assignment of error addresses a separate breach of contract claim.
 STANDARD OF REVIEW {¶ 10} This court conducts a de novo review of a trial court's decision on summary judgment. White v. DePuy, Inc. (1999),129 Ohio App.3d 472, 478. In applying the de novo standard, we review the trial court's decision independently and without deference to the trial court's determination. Id. at 479. A court may grant summary judgment only when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence submitted that reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor. Civ. R. 56(C); Welco Indus., Inc. v. Applied Cos.,67 Ohio St.3d 344, 346, 1993-Ohio-191.
 {¶ 11} Assignment of Error No. 1:
 {¶ 12} "THE TRIAL COURT ERRED BY GRANTING DHL'S MOTION FOR SUMMARY JUDGMENT ON THE FIRST CLAIM FOR RELIEF."
 {¶ 13} In the first assignment of error, Air-Ride claims the trial court erred in granting DHL's motion for summary judgment based upon Section 3.01(B)(2) of the contract.
 {¶ 14} Section 3.01(B)(2) of the parties' contract provides:
 {¶ 15} "The air freight industry environment and desire of [DHL] to provide and maintain excellent service and value to its customers may from time to time require [DHL] to modify or terminate lanes of traffic with little advance notice. [DHL] will endeavor to provide [Air-Ride] as much advance notice as practical when making such changes in service; however, [DHL] reserves the right to terminate individual Flights and affected lanes of traffic upon three (3) days advance written notice if market conditions, network optimization, business requirements or [Air-Ride's] nonperformance render a flight unfavorable to continue *Page 5 
as contracted. Upon termination, with respect to any individual Flight identified in this Section 3.01(B)(2), neither party shall have any further obligation to the other with respect to such Flight."
 {¶ 16} Air-Ride presents two challenges to the trial court's decision. First, Air-Ride urges that the terms of Section 3.01(B)(2) do not allow DHL "to terminate the entire Agreement at its sole discretion on three-days notice." Second, Air-Ride claims that "unfavorable" conditions were not present to allow DHL to terminate the flights.
 A. Section 3.01(B)(2) {¶ 17} The purpose of contract construction is to discover and effectuate the intent of the parties, and the intent of the parties is presumed to reside in the language they chose to use in their agreement.Graham v. Drydock Coal Co., 76 Ohio St.3d 311, 313, 1996-Ohio-393. A contract is read as a whole, giving effect to every part of the agreement, and the intent of the parties is to be determined from the contract as a whole. 18 Ohio Jurisprudence 3d (2001) 23, Contracts, Section 120. All the provisions of a contract must be construed together in determining the meaning and intention of any particular word, clause, or provision in the contract. Id. "A court construing a provision in a * * * contract or other writing may not ignore the existence of any word or phrase." Cleveland Elec. Illuminating Co. v. City of Cleveland
(1988), 37 Ohio St.3d 50, 53.
 {¶ 18} Air-Ride argues that Section 3.01(B)(2) does not permit DHL to terminate the agreement, including all of Air-Ride's flights, on three-days notice. Moreover, Air-Ride suggests that, in order to terminate a flight, Section 3.01(B)(2) requires DHL to terminate the entire "lane of traffic." Since DHL did not terminate the affected lane of traffic, it cannot terminate Air-Ride's flight. Finally, Air-Ride argues that the flight terminations were not "individual."
 {¶ 19} Section 3.01(B)(2) clearly enables DHL to "modify or terminate" its various *Page 6 
lanes of traffic on three-days notice under certain conditions. The section's second sentence directs which conditions must be present for DHL to "terminate individual Flights."
 {¶ 20} The trial court in this case acknowledged Air-Ride's creative interpretation, claiming that an entire lane of traffic must be terminated in order to terminate the corresponding flights. However, that is not what the provision states. The provision allows DHL to "modify" its various lanes of traffic, whether these modifications include changing the times of the flights, number of flights, or even terminating flights. Each of which could constitute a "modification" to a lane of traffic without eliminating the entire lane of traffic. Although Air-Ride's interpretation is creative, it is incorrect and inconsistent with the contract language. As a result, DHL is entitled under the contract to terminate flights when one of the contractual conditions exists.
 B. Unfavorable Conditions {¶ 21} In this case, DHL states that it eliminated the Air-Ride flights because network optimization rendered the flights unfavorable. Air-Ride argues that summary judgment was inappropriate because DHL failed to establish that Air-Ride's flights actually were unfavorable. Specifically, Air-Ride argues that genuine issues of material fact exist regarding DHL's network optimization and that no evidence was presented to address whether the prerequisite "market conditions" exist. Air-Ride classifies the changes made by DHL as mere modifications to the already-existing network.
 {¶ 22} The trial court in this case remarked that "[t]here is unrebutted evidence that all of Air-Ride's hub-to-hub flights were in June 2006 at least unfavorable * * * to continue as contracted. And DHL acted, I think the evidence shows, under the terms of that section in the optimization of the DHL network resulting from market conditions."
 {¶ 23} The record supports the trial court's decision. Significant, unrebutted evidence demonstrates that in April 2006 DHL began to conduct and implement a comprehensive *Page 7 
network optimization. The company streamlined its operations by re-engineering the schedule and reducing the number of trucks, flights and carriers. DHL reduced the number of one-way trips from approximately 165 to 80, modified departure and arrival times, as well as increased and decreased the number of lanes operating between various hubs as necessary.
 {¶ 24} DHL's Travis Cobb described in his deposition that DHL "baselined all origin/destination volumes moving throughout the 19 hub-to-hub network, created schedules to support those volumes, and optimized those from both a round-up perspective as well as from a service sensitive perspective, in creating better arrival windows to enhance DHL service to our customers."
 {¶ 25} The evidence shows that the contracted flights between Air-Ride and DHL were less profitable and, ultimately, unfavorable. Moreover, the trial court stated, "I recognize that it is extraordinary that all of the flights were terminated and eliminated in the manner that they were at one time, but I do find that the clear language of Section 3.01(B)(2) does in fact give DHL that right."
 {¶ 26} Air-Ride urges that, pursuant to the contract language, term ination of flights can only be "individual" in nature and that DHL could not terminate all of the flights at one time as occurred in this case.
 {¶ 27} It may be unusual that all of Air-Ride's flights were eliminated at once, but there is no provision preventing such termination. In sum, the record demonstrates that DHL's network optimization rendered Air-Ride's flights unfavorable and, pursuant to Section 3.01(B)(2) of the agreement, DHL could terminate the flights.
 {¶ 28} Air-Ride's first assignment of error is overruled.
 {¶ 29} Assignment of Error No. 2:
 {¶ 30} "THE TRIAL COURT ERRED BY GRANTING DHL'S MOTION FOR *Page 8 
SUMMARY JUDGMENT ON THE THIRD [SIC] CLAIM OF RELIEF."
 {¶ 31} In its second assignment of error, Air-Ride argues the trial court erred by granting summary judgment in favor of DHL based upon Section 2.01 of the contract. Section 2.01 states:
 {¶ 32} "Term. Unless terminated earlier pursuant to Section 3.01
hereof or by [DHL] providing ninety (90) days prior written notice to Contractor, this Agreement shall commence on the Effective Date and remain in effect for a period of three (3) years (the "Initial Term"). Unless either Party provides written notice to the other Party not more than ninety (90) days prior to the end of the initial term, this Agreement will continue in full force and effect after the initial term until such time that ninety (90) days' written notice is provided."
 {¶ 33} Air-Ride argues that Section 2.01 creates a three-year contract between the parties that could not be terminated earlier. Air-Ride argues that the trial court should have considered "evidence of the parties' practical interpretation of the agreement." In support of its argument, Air-Ride cites Overhead, Inc. v. Standen Contracting Co.,Inc., Lucas App. No. L-01-1397, 2002-Ohio-4946, claiming that evidence of the prior course of dealing between the parties should be examined to interpret the agreement.
 {¶ 34} Overhead addresses the applicability of a change of venue provision that was omitted from an oral contract. The parties inOverhead contracted for the sale of wood doors used in sound remediation projects for private residences. Id. at ¶ 4. In 1998, Standen submitted a purchase order for wood doors for a project in Toledo. Id. The order was written on a preprinted form containing an acknowledgement that the venue for all potential actions was Massachusetts. Id. at ¶ 8. Over the following two years, Standen placed several oral and written orders with Overhead. Id. at ¶ 9-12. In 2001, Overhead filed suit in Lucas County against Standen for unpaid invoices. Id. at ¶ 13. Standen moved to dismiss due to improper venue. Id. Overhead argued that Lucas County was proper because no choice of venue *Page 9 
provision was included in the subsequent agreements. Id. The trial court found, based on the course of dealing between the parties, that the choice of venue clause applied to all agreements between the parties. Id. at ¶ 19. Overhead appealed, arguing the trial court mistakenly used "course of dealing" to add a venue term to the oral agreements. Id. at ¶ 20. The Sixth Appellate District affirmed.
 {¶ 35} Air-Ride's reliance upon Overhead is faulty for multiple reasons. First, the court was addressing the terms of an oral agreement. Id. at ¶ 25. Extrinsic evidence of the parties' agreement was necessary to determine the terms. Second, Overhead deals with omitted terms of a contract. No term is omitted in this case. The provision describing the duration of the contract is included in the parties' agreement.
 {¶ 36} If a provision cannot be determined from the four corners of the agreement, a factual determination of intent may be necessary to ascertain the provision's meaning. Inland Refuse Transfer Co. v.Browning-Ferris Indus. of Ohio, Inc. (1984), 15 Ohio St.3d 321, 322. In making such a factual determination, "the court may use extrinsic evidence to facilitate the inquiry." Kelly v. Med. Life Ins. Co. (1987),31 Ohio St.3d 130, 132. Extrinsic evidence, however, is inadmissible when it is sought to contradict the express terms of the written agreement. Shifrin v. Forest City Ent., Inc., 64 Ohio St.3d 635, 638,1992-Ohio-28.
 {¶ 37} "A court's primary objective in interpreting a written contract is to ascertain the intent of the parties as expressed in the terms of the agreement." Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.,86 Ohio St.3d 270, 273, 1998-Ohio-162. Thus, a contract should be construed in a manner to give effect to the intentions of the parties. Id. The agreement of parties to a written contract is to be ascertained from the language of the instrument itself, and there can be no implication inconsistent with the express terms thereof. Id. at 274, citingLatina v. Woodpath Dev. Co. (1991), 57 Ohio St.3d 212, 214. See, also,Kelly v. Med. Life Ins. Co. (1987), 31 Ohio St.3d 130, paragraph one of the syllabus. *Page 10 
 {¶ 38} Moreover, Air-Ride relies upon Restatement of the Law 2d, Contracts (1979), Course of Dealing, Section 223, Comment b, citing that "[t]here is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown * * *." However, Air-Ride omits the preceding language in Comment b which states that "[c]ourse of dealing may become part of an agreement either by explicit provision or by tacit recognition, or it may guide the court in supplying an omitted term." None of those qualifiers are present in this case. Specifically, no "explicit provision" or "tacit recognition" of the course of dealing is acknowledged in the contract. Nor are there any omitted terms. Accordingly, an examination of the course of dealing is unnecessary.
 {¶ 39} The terms of Section 2.01 are unambiguous. Accordingly, no extrinsic evidence is necessary to determine the parties' intent or "practical construction." The trial court in this case similarly held, "I find that section as it is written as unambiguous and that it has to be read as two separate sentences; that the first sentence relates to the length of the three-year term and how it can be shortened, whereas the second sentence of that section relates exclusively to each party's ability to, or right to, terminate the length of the agreement after the initial term by 90 days notice. * * * Based on those findings that this language is unambiguous in 2.01, the arguments relative to the history and dealings between ABX and DHL and I find would be improper because that would only be relevant if the Court found that the agreement or certain terms of the agreement were ambiguous, and then it would be relevant to defining the intent of the parties * * *."
 {¶ 40} Under the express terms, Section 2.01 provides for a term of three years unless the agreement is terminated under Section 3.01 or by DHL providing 90 days prior written notice to Air-Ride. This court will give effect to unambiguous contractual terms. Fultz Thatcher v.Burrows Group Corp., Warren App No. CA2005-11-126, 2006-Ohio-7041. Section 2.01 clearly references the additional termination provisions of Section 3.01, noting *Page 11 
that termination may occur under either instance.
 {¶ 41} Air-Ride's second assignment of error is overruled.
 {¶ 42} Assignment of Error No. 3:
 {¶ 43} "THE TRIAL COURT ERRED BY GRANTING DHL'S MOTION FOR SUMMARY JUDGMENT ON THE THIRD CLAIM FOR RELIEF."
 {¶ 44} In the third assignment of error, Air-Ride claims the trial court erred by granting summary judgment in favor of DHL based upon Section 1.27 of the agreement, finding that DHL did not breach the agreement by eliminating the hub managers. Section 1.27 requires Air-Ride "to provide * * * hub management services as identified in Schedule `A' and Schedule 1.27" attached to the parties' agreement. Air-Ride argues that DHL breached the contract by no longer requiring Air-Ride to provide hub managers and no longer paying for the hub management services.
 {¶ 45} The trial court in this case held that Section 1.27 "was clearly for the benefit of DHL * * * and * * * that they could terminate or no longer require those managers to be maintained by Air-Ride since there was no reciprocal right in the contract on the part of Air-Ride."
 {¶ 46} Section 1.27 was a unilateral benefit provision for DHL, requiring Air-Ride to provide hub management services. As such, DHL could terminate this requirement at its discretion. 17 Ohio Jurisprudence 3d (2008), Contracts, Section 5.
 {¶ 47} Air-Ride's third assignment of error is overruled.
 {¶ 48} Accordingly, no genuine issue of material fact exists and DHL is entitled to judgment as a matter of law.
 {¶ 49} Judgment affirmed.
 WALSH, P.J., and YOUNG, J., concur. *Page 1