*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0245P (6th Cir.)
File Name:  00a0245p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

JOCELYN TOMPKIN,
     *Plaintiff-Appellant,*

     *v.*

AMERICAN BRANDS, et al.,
     *Defendants,*

PHILLIP MORRIS, INC., et al.,
     *Defendants-Appellees.*

No. 98-4445

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 94-01302—David D. Dowd, Jr., District Judge.

Argued:  May 2, 2000

Decided and Filed:  July 24, 2000

Before:  JONES, NELSON, and CLAY, Circuit Judges.

————————

## COUNSEL

**ARGUED:**  A. Russell Smith, A. RUSSELL SMITH LAW OFFICES, Akron, Ohio, for Appellant.  Craig E. Gustafson, SHOOK, HARDY & BACON, Kansas City, Missouri, for Appellees.  **ON BRIEF:**  A. Russell Smith, R. Bryan Nace,

A. RUSSELL SMITH LAW OFFICES, Akron, Ohio, for Appellant. Craig E. Gustafson, SHOOK, HARDY & BACON, Kansas City, Missouri, Kenneth J. Walsh, Tyler L. Mathews, McDONALD, HOPKINS, BURKE & HABER CO., LPA, Cleveland, Ohio, Mary M. Bittence, Diane P. Chapman, BAKER & HOSTETLER, Cleveland, Ohio, Patrick M. McLaughlin, McLAUGHLIN & McCAFFREY, Cleveland, Ohio, David S. Cupps, J. Scott Jamieson, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, Thomas E. Riley, Danielle Pareja Langhoff, CHADBOURNE & PARKE, New York, New York, for Appellees.

JONES, J., delivered the opinion of the court, in which CLAY, J., joined. NELSON, J. (pp. 20-27), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

NATHANIEL R. JONES, Circuit Judge. Plaintiff-Appellant Jocelyn Tompkin, the widow of decedent David Tompkin, brought the underlying products liability suit against Defendants-Appellees The American Tobacco Company, Phillip Morris, Inc., Lorillard Tobacco Co., Lorillard, Inc., and Liggett Group. Mrs. Tompkin asserted that Defendants' cigarettes were defective under the Ohio Products Liability Act ("OPLA"), and that these defective products caused her husband's death. Mrs. Tompkin also asserted common law negligence, wilful and wanton misconduct, and implied warranty claims. Defendants ultimately moved for summary judgment, and the district court granted their motions. Specifically, the district court concluded that because the dangers of cigarette smoking were "common knowledge" during the time Mr. Tompkin smoked, Mrs. Tompkin had not asserted an actionable claim under OPLA. Regarding Mrs. Tompkin's common law claims, the district court concluded that Mrs. Tompkin's negligence, wanton misconduct, and implied warranty claims were pre-empted by OPLA. On appeal, while we agree that OPLA

in *Nadel*, I believe that this court is free to apply §§ 2307.73(A) and 2307.71(M) as written. I would therefore affirm the summary judgment on Mrs. Tompkin's implied warranty claim.

supplier for death, physical injury to a person, emotional distress, or physical damage to property other than the product involved, that allegedly arose from any of the following:

(1) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;

(2) Any warning or instruction, or lack of warning or instruction, associated with that product;

(3) Any failure of that product to conform to any relevant representation *or warranty*." (Emphasis added.)

This language seems plainly to say that a claim based on breach of an implied warranty is a "product liability claim" that is governed exclusively by the Ohio Products Liability Act.

The majority reaches a contrary conclusion on the basis of the court of appeals' decision in *White v. DePuy, Inc.*, 718 N.E.2d 450, 454-56 (Ohio App. 1998). In my view, *White* is not controlling. In *Nadel v. Burger King Corp.*, 695 N.E.2d at 1189-90, another Ohio court of appeals held, applying §§ 2307.73(A) and 2307.71(M), that the Ohio Products Liability Act has preempted common-law claims based on implied warranties. No decision of the Ohio Supreme Court has resolved this conflict within the Ohio courts of appeals. The *White* court relied on *Carrel v. Allied Products Corp.*, 677 N.E.2d 795 (Ohio 1997), an Ohio Supreme Court decision holding that the Act preempts only those claims that it "specifically cover[s]," but (as the majority notes, Maj. Op. at 18) the only claim at issue there was a claim of negligent design. *Carrel* therefore does not compel the conclusion that other product claims may proceed under the common law. In fact, the *Nadel* court expressly acknowledged *Carrel* but determined that that decision did not control the question before it. See *Nadel*, 695 N.E.2d at 1190 n.4. Given the lack of controlling precedent and the persuasive statutory analysis

preempts Mrs. Tompkin's negligence and wanton misconduct claims, we find that Ohio common law continues to recognize an independent breach of implied warranty action. Additionally, we hold that a genuine issue of material fact exists on the extent of contemporaneous "common knowledge" on the link between cigarette smoking and lung cancer. Accordingly, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings.

## I.

In 1950, at the age of sixteen, David Tompkin started smoking. From 1950 to 1955, Mr. Tompkin smoked approximately one-half to one pack per day of Old Gold, Phillip Morris, and Chesterfield cigarettes. Between 1955 and 1959, Mr. Tompkin increased his cigarette consumption to between one and two packs per day, and smoked Phillip Morris, Pall Mall, and Herbert Tareyton cigarettes. From 1960 to 1965, Mr. Tompkin smoked between two and three packs of Kent cigarettes daily. He also claimed that he smoked Camel cigarettes but could not remember precisely when he used that brand. In 1965, at the age of 31, Mr. Tompkin stopped smoking.

Mr. Tompkin was diagnosed with lung cancer in 1992. In June 1994, joined by his wife, Mr. Tompkin sued Defendants for a number of product liability and tort claims, essentially asserting that Defendants had misrepresented the dangers associated with cigarette smoking and that their cigarettes proximately caused his lung cancer. On February 12, 1996, Mr. Tompkin died from complications caused by his lung cancer, and Mrs. Tompkin continued the action.

In her amended complaint, Mrs. Tompkin asserted: 1) Defendants were strictly liable for the harms caused by their cigarettes (Count 2); 2) Defendants committed negligent, wilful, and wanton misconduct by failing to warn consumers of the dangers of cigarette smoking (Count 3); 3) Defendants committed fraud and misrepresentation in marketing their cigarettes (Count 4); 4) Defendants were strictly liable for misrepresenting the dangers of their cigarettes (Count 5);

5) Defendants breached an expressed warranty regarding the safety of their cigarettes (Count 6); 6) Defendants breached an implied warranty regarding the safety of their cigarettes (Count 7); 7) Defendants conspired to commit illegal acts in connection with the sale and distribution of their cigarettes; and 8) derivative claims for damages, wrongful death, and loss of consortium (Counts 9-11). *See* J.A. at 68-77.

During discovery, Mrs. Tompkin presented a report and deposition from Dr. Elizabeth Whelan. Dr. Whelan, who has a masters degree from Yale University and a doctorate from the Harvard School of Public Health, is the President of the American Council on Science and Health. Dr. Whelan reviewed a variety of information, ranging from periodicals to polling data to industry reports, and concluded that "at no time [between 1950 and 1965] were cigarette smokers informed as to the true nature of the risks that they were assuming, even though that information was available to the [tobacco] industry." J.A. at 562. Dr. Whelan cited reports by the American Medical Association showing, as late as 1963, that it needed to do more research on the link between lung cancer and cigarette smoking. *See* J.A. at 564; Whelan Dep. at 147. In reviewing cigarette advertising during the relevant time period, Dr. Whelan stated that cigarette-related health hazards simply were not covered.

She further noted that the misleading communications of the tobacco industry exacerbated the ambiguity respecting the nexus between lung cancer and cigarette smoking. She cited the industry's "A Frank Statement to Cigarette Smokers," which was a 1957 open letter from cigarette makers to the public. The open letter explained that "eminent doctors and research scientists" had critiqued the "theory that cigarette smoking is in some way [linked] with lung cancer in human beings." J.A. at 258. It also chastised the continued allegations that have "held [tobacco] responsible for practically every disease of the human body." *Id.* The letter noted that "[o]ne by one these charges have been abandoned for lack of evidence," and asserted plainly that "the products we make are not injurious to health." *Id.*

these cases suggests that a record such as that developed here – *i.e.*, a record demonstrating widespread public awareness of the existence, though not the magnitude, of a non-negligible risk – is insufficient to establish "common knowledge" of that risk.

In sum, I believe that the majority answers the wrong question when it decides that "a rational factfinder could reasonably conclude that the public did not have 'common knowledge' of the *strong* connection between cigarette smoking and lung cancer between 1950 and 1965." Maj. Op. at 17 (emphasis added). Whether the public appreciated the full strength of the connection between cigarette smoking and lung cancer may well be open to doubt, but the relevant question is whether that connection itself – *i.e.*, the fact that cigarette smoking is a significant cause of lung cancer – was a matter of common knowledge during the years at issue. On the undisputed evidence before us, a reasonable factfinder could only conclude that it was. I would therefore affirm the summary judgment on Mrs. Tompkin's failure to warn and design defect claims.

II

Were one to look only at the text of the Ohio Products Liability Act, it would seem obvious that Mrs. Tompkin's claim for breach of an implied warranty may be pursued only within that statutory framework, and not as a common-law cause of action. Section 2307.73(A) provides that a manufacturer may be held liable on a "product liability claim" only if the plaintiff establishes the statutory requirements for liability. "[P]roduct liability claim" is defined in § 2307.71(M) as

"a claim asserted in a civil action . . . that seeks to recover compensatory damages from a manufacturer or

_____

smoking were well known" before 1964 and that "a more expansive application of the common knowledge doctrine may well be available on a motion for summary judgment." See *Guilbeault*, 84 F.Supp.2d at 274.

cancer was reported with a frequency and an intensity that would have suggested to any rational observer that the risk was not negligible. The public would not have expected the attention of physicians, scientists, and government officials to be captured so extensively by a remote, insignificant danger. The undisputed facts appear to me to establish common knowledge of a significant link between cigarette smoking and lung cancer.

I do not think that my application of Ohio law to the facts of this case is inconsistent with other courts' applications of state "common knowledge" doctrines in cases involving cigarette smoking. The majority relies heavily on *Burton v. R.J. Reynolds Tobacco Co.*, 884 F.Supp. 1515, 1526 (D. Kan. 1995), in which the court rejected an argument that "because there is general common knowledge that cigarettes are dangerous, users of cigarettes are therefore imputed with knowledge of the extent and nature of all dangers relating to cigarettes." The court's point was not that "common knowledge" entails substantial awareness of the magnitude of a particular risk. The point, rather, was that common knowledge of *some* risks associated with cigarette smoking does not necessarily imply common knowledge of *all* risks associated with cigarette smoking (such as the risk of addiction). See *id.* at 1525-26.[1] Moreover, in *Burton* as well as in *Hill v. R.J. Reynolds Tobacco Co.*, 44 F.Supp.2d 837, 844 (W.D. Ky. 1999), and *Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F.Supp.2d 263, 270-75 (D.R.I. 2000), the court was asked to make a determination as to "common knowledge" without the benefit of a factual record.[2] None of

---

[1] Like the court in *Burton*, other courts refusing to apply the "common knowledge" doctrine have done so when the alleged harm was addiction rather than disease in the ordinary sense. See *Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F.Supp.2d 263, 270-72 (D.R.I. 2000) (discussing cases).

[2] In *Guilbeault*, after declining to take judicial notice as to the public's knowledge of the risks of cigarette smoking before 1964, the court noted that "there is extensive evidence that the health dangers of

Dr. Whelan testified that the open letter and similar industry representations "dramatically misrepresented the available data" on the health hazards of smoking. J.A. at 574. While Dr. Whelan conceded that contemporaneous polls demonstrated that more than 90% of smokers were aware that smoking was dangerous to their health and were also aware of a link between smoking and lung cancer, *see* J.A. at 601, she testified that there was "no reason to believe from those polls that [the public had] general knowledge on the dangers of cigarettes as the scientists understood [them] at the time." J.A. at 604. Dr. Whelan concluded that these polls show that the public had a vague and generic understanding of smoking's dangers. Indeed, Dr. Whelan concluded: "[A]s far as I know, people thought cigarette smoke was simply as dangerous as breathing city air." *Id.* In this regard, Dr. Whelan testified that the public's awareness of the carcinogenic risks of smoking were "hypothetical." *Id.* at 613.

Dr. Whelan's report also noted that Congress did not require any cautionary labeling or warnings on cigarettes until 1966, when the Federal Cigarette Labeling and Advertising Act ("Labeling Act"), Pub.L. 89-92, § 2, 79 Stat. 282 (1966), required all cigarette packages to read "CAUTION: CIGARETTE SMOKING MAY BE HAZARDOUS TO YOUR HEALTH." Dr. Whelan further provided that because the 1966 Act failed to adequately apprise the public of the health risks of smoking – largely because of the tobacco industry's systemic efforts to nullify public awareness of tobacco's health risks, *see* J.A. at 504 – Congress passed successive amendments to the Labeling Act in hopes of broadening public awareness of tobacco's dangers.

Specifically, in 1969, Congress amended the Labeling Act to require that cigarette packages read: "WARNING: THE SURGEON GENERAL HAS DETERMINED THAT CIGARETTE SMOKING IS DANGEROUS TO YOUR HEALTH." Public Health Cigarette Smoking Act of 1969, Pub.L. 91-222, 84 Stat. 87, as amended, 15 U.S.C. §§ 1331-1340. Moreover, to provide greater specificity regarding the

risks of smoking, Congress further amended the Labeling Act in 1984.  The 1984 Amendments mandated a set of four rotating labels, including: "SURGEON GENERAL'S WARNING: Smoking Causes Lung Cancer, Heart Disease, and Emphysema."  Pub.L. 98-474, 98 Stat. 2200, 2201.  Dr. Whelan contends that these continued amendments to the Labeling Act demonstrate that at least during the period that Mr. Tompkin smoked, if not as late as 1984, the public did not possess any specific knowledge as to the dangers posed by cigarette smoking.

Along these lines, Dr. Whelan's expert report cited extensively from a 1981 Federal Trade Commission ("FTC") survey that indicated:

> While most Americans are generally aware that smoking is hazardous, some consumers, especially smokers, do not know this basic fact.  However, even if it is assumed that every consumer is aware that smoking is hazardous, the evidence indicates that many consumers do not have enough information about the health risks of smoking in order to know how dangerous smoking is i.e. what is the nature and extent of the health risk of smoking. . . .  The data also indicate that substantial numbers of consumers seriously misunderstand and underestimate the increased risk of suffering . . . health problems as a result of smoking.  For example . . . over 40% of those polled did not know that smoking caused *most* (80%) cases of lung cancer and nearly one-quarter of those polled did not even know that it causes *many* cases.

J.A. at 501 (emphasis in original).  The FTC report further provided that although scientific data showed that smoking only a few cigarettes per day may be harmful, 40% of smokers believed that only heavy smoking was dangerous. *Id.*

In addition to Dr. Whelan's report and deposition, Mrs. Tompkin introduced government reports attesting to attempts by the tobacco industry to "neutralize public awareness of the health hazards of smoking," *see* 29 Fed. Reg. 8361 (July 2,

same anti-smoking information in the 1950s and 1960s that was in keeping with the uniform national media coverage about the dangers of tobacco use.  Headlines in the Akron newspapers, for example, proclaimed:  'U.S. Warns of Cigaret [sic] Cancer Link,' and 'Cigarets DO Cut Life's Length.' . . . Anyone reading the headlines in Ohio newspapers during these decades could not have missed the message:  smoking was linked to lung cancer.

*     *     *

Beginning in the late 1930s physicians began to report that most of their lung cancer patients were cigarette smokers. . . .  In 1954 the media widely reported on a study . . . demonstrating a statistical link between heavy smoking and lung cancer.

*     *     *

It became next to impossible to be a literate American in the 1950s and not be aware of the numerous scientific reports and government statements linking smoking to lung cancer.

*     *     *

[B]y the summer of 1954 almost ninety (89.9) percent of the general public had 'heard or read [something] recently to the effect that cigarette smoking may be [a] cause of cancer of the lung.'  By the summer of 1957 almost eighty percent had heard or read about the American Cancer Society's report linking lung cancer with smoking.  As early as 1960, ninety-seven percent of all high school students believed that there was a connection between lung cancer and smoking . . . ."

It is logically possible, I suppose, to read such evidence and conclude that the public was aware of the risk that cigarette smoking can cause lung cancer but believed the risk to be insignificant.  In my view, such a conclusion would be unreasonable.  The link between cigarette smoking and lung

the use of an improperly vented gas furnace" to be a matter of common knowledge – and did so without addressing the public's understanding of the frequency with which such poisonings might be expected to occur. Again, in *Nadel v. Burger King Corp.*, 695 N.E.2d 1185, 1191-92 (Ohio App.), *appeal not allowed*, 684 N.E.2d 706 (Ohio 1997) – a case in which the court reversed a summary judgment that had been based on the "common knowledge" doctrine – the court did not discuss the magnitude of the risk at issue. The question held to be for the jury in that case was whether the public is aware that a particular risk exists – *i.e.*, whether it is commonly known that "second-degree burns can result from spilled [fast-food] coffee." *Id.* at 1191. There is a difference, it seems to me, between common knowledge that a particular harm is within the range of reasonably possible outcomes and common knowledge of the degree of probability that a particular harm will in fact ensue. So far as I am aware, the Ohio courts have never required the latter when applying §§ 2307.75(E) and 2307.76(B).

Accordingly, it seems to me that the link between cigarette smoking and lung cancer could have been a matter of "common knowledge" under the Ohio Products Liability Act regardless of whether the public knew that "cigarette smoking is a *strong* precipitant of lung cancer." Maj. Op. at 12 (emphasis added). If the public knew that cigarette smoking can cause cancer, and that the risk is not insignificant, that is enough for the "common knowledge" doctrine to bar Mrs. Tompkin's claims of design defect and failure to warn. Nothing in the Ohio code or case law suggests a requirement that the magnitude of the risk be known with any greater specificity.

In this case, to repeat, the record establishes that the public did know, between 1950 and 1965, that cigarette smoking presents a significant risk of lung cancer. In particular, the appellees' expert testified without contradiction that

"[a]fter World War II, all major Ohio newspapers (including the *Akron Beacon Journal*) published the

1964), and industry memos showing an intent to obfuscate the links between smoking and cancer. Mrs. Tompkin further alleged that her husband recalled a 1954 advertisement by Chesterfield, which provided:

Again and again, over a full year and a half a group of Chesterfield smokershave been given thorough medical examinations [and] the doctor's reportsare a matter of record [:] "*No adverse effects to the nose, throat, and sinuses from smoking Chesterfields.*" A responsible independent research laboratorysupervises this continuing program.

J.A. at 718 (emphasis in original).

In response, Defendants presented the report of Dr. Joan Hoff, a History Professor at Ohio University's Contemporary History Institute. Based upon her survey of the social and cultural history of tobacco and cigarette smoking, Dr. Hoff was "convinced . . . that there is no other product in the history of the western world that has been so vilified as dangerous to human health and habit forming and yet so universally used." J.A. at 200-01. Dr. Hoff's report traced public perceptions concerning the health hazards of smoking tobacco from the time of King James I through the 1950s and 1960s, the period in which Mr. Tompkin smoked. In pertinent part, Dr. Hoff found the following:

[1] By 1936 the Ohio Department of Education was regularly publishing detailed syllabi for all Health and Physical Education classes from grades seven through twelve which included detailed discussion points about the harmful health effects of tobacco. . . . [A]fter World War II . . . Ohio health text books [began] to include examples of why girls, as well as boys, should avoid the smoking habit. Since the 1930s this instructional injunction had been reenacted by the state legislature in 1953, 1970, 1975, 1978, and 1980. No school child educated in Ohio would have been able to avoid such instruction for the entire twentieth century.

[2] After World War II, all major Ohio newspapers (including the Akron Beacon Journal) published the same anti-smoking information in the 1950s and 1960s that was in keeping with the uniform national media coverage about the dangers of tobacco use. Headlines in the Akron newspapers, for example, proclaimed: "U.S. Warns of Cigaret [sic] Cancer Link," and "Cigarets [sic] DO Cut Life's Length."

[3] [I]n the 1940s such well-known newspapers and popular magazines as the New York Times, Readers Digest, Life, Scribner's, Saturday Evening Post,Newsweek, and Time, began to publish the results of scientific medical reports about lung cancer and smoking. Readers Digest was unusually influential in conveying such information because it had the largest national circulation during the decades before and after the Second World War, and it condensed the results of these reports so that Americans could readily understand them.

[4] [I]n 1954 the media widely reported on a study of 187,788 men by Hammond and Horn, demonstrating a statistical link between heavy smoking and lung cancer. . . . After appointing a task force in 1956 to look at the early statistical reports linking smoking with lung cancer, Surgeon General Leroy Burney proclaimed in 1957 that smoking was "the *principal* factor in the increased incidence of lung cancer."
. . .

[5] It became next to impossible to be a literate American in the 1950s and not be aware of the numerous scientific reports and government statements linking smoking to lung cancer. Throughout the decade, TV coverage reinforced longstanding negative common knowledge about the health dangers of tobacco.

[6] [B]y the summer of 1954 almost ninety (89.9) percent of the general public had "heard or read [something]

The relevant sections of the Ohio Product Liability Act are codified at §§ 2307.75(E) and 2307.76(B) of the Ohio Revised Code. Section 2307.75(E) provides that "[a] product is not defective in design or formulation if the harm for which the claimant seeks to recover . . . was caused by an inherent characteristic of the product . . . which is recognized by the ordinary person with the ordinary knowledge common to the community." That is, if the harm-causing characteristic of a product – in this case, cigarettes' carcinogenicity – is a matter of common knowledge, then a design defect claim based on that characteristic cannot succeed. Similarly, § 2307.76(B) provides that "[a] product is not defective due to [lack of or inadequate warning] as a result of the failure of its manufacturer to warn or instruct about an open and obvious risk or a risk that is a matter of common knowledge."

As I read these statutory provisions, they say nothing about the magnitude of the risk or the likelihood that an inherent characteristic such as carcinogenicity will actually cause harm in a given case. Of course, the chance of harm must be something more than negligible – otherwise, the risk would not be regarded as a risk at all. But public awareness that the product presents a specific and appreciable danger, without any more detailed knowledge of that danger's nature or extent, would seem sufficient, under the Act, to preclude recovery.

Ohio cases applying §§ 2307.75(E) and 2307.76(B) appear consistent with my reading of the statutory language. In *Gawloski v. Miller Brewing Co.*, 644 N.E.2d 731, 733 (Ohio App.), *appeal not allowed*, 641 N.E.2d 1110 (Ohio 1994), the court held that the dangers of alcohol use, including the risk of alcoholism, are "within the body of knowledge common to the community." In so holding the court made no finding that the public has any substantial understanding of the likelihood that alcohol use will lead to alcoholism. Knowledge that a significant risk exists was enough to preclude liability. Similarly, in *Hanlon v. Lane*, 648 N.E.2d 26, 30 (Ohio App. 1994), *appeal not allowed*, 646 N.E.2d 467 (Ohio 1995), the court found "the danger of carbon monoxide poisoning from

---

**CONCURRING IN PART, DISSENTING IN PART**

---

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part. My colleagues' resolution of the primary issue in this appeal rests on the premise that a risk is not a matter of "common knowledge" unless the public has a relatively precise understanding of the degree of risk. It seems to me that this sets the bar too high. The record before us shows that a significant link between cigarette smoking and lung cancer was well known during the years that Mr. Tompkin smoked, and I therefore agree with the district court that the "common knowledge" doctrine bars Mrs. Tompkin's design defect and failure to warn claims. In addition, my reading of the Ohio Products Liability Act compels the conclusion that Mrs. Tompkin's claim for breach of an implied warranty – like her claims of negligence and willful misconduct – can no longer be maintained under the common law. Because there is no contrary consensus in the Ohio courts, I would affirm the summary judgment on that claim as well. In all other respects I concur in the majority opinion.

## I

The factual record in this case clearly establishes that the public has long understood cigarette smoking to be unhealthful. More particularly, the undisputed evidence demonstrates that most Americans were aware by the late 1950's that cigarette smoking can cause lung cancer. As the majority sees it, however, this awareness does not amount to "common knowledge" of the link between cigarette smoking and lung cancer absent evidence that the public understood – with some undefined, but substantial, degree of specificity – the closeness of that link. I respectfully disagree. In my view, the "common knowledge" doctrine incorporated in the Ohio Products Liability Act requires widespread recognition that a non-negligible risk exists, but it does not require detailed understanding of the magnitude of that risk.

recently to the effect that cigarette smoking may be cause of cancer of the lung."

[7] By the summer of 1957 almost eighty percent had heard about or read the American Cancer Society's Report linking lung cancer with smoking.

[8] As early as 1960, ninety-seven percent of all high school students believed that there was a connection between lung cancer and smoking.

*Tompkin v. American Brands*, 10 F.Supp.2d 895, 902-03 (N.D. Ohio 1998); J.A. at 205-09.

Following discovery, which primarily featured the clash of the Whelan and Hoff reports, Defendants moved for summary judgment. The district court concluded that Counts Two through Six of Mrs. Tompkin's amended complaint were governed by OPLA. *See id.* at 899-900. The court further concluded that OPLA's "common knowledge" doctrine, which exempts products from liability for harms that are "recognized by the ordinary person with the ordinary knowledge common to the community," Ohio Rev. Code § 2307.75(E), applied in this case. *Id.* at 905. In reaching this conclusion, the court ruled that "[i]t is clear that a reasonable fact-finder could not fail to conclude that the health risks from smoking, particularly the risk of lung cancer, was 'common knowledge' in 1950 when the plaintiff's decedent began to smoke." *Id.* The district court ruled therefore that the public's knowledge of smoking's health dangers disposed of any design defect or failure to warn claims raised in Mrs. Tompkin's complaint.

After concluding that Mrs. Tompkin's misrepresentation claim also fell under OPLA, the district court ruled that she had not shown that Mr. Tompkin sufficiently relied upon any of Defendants' representations. Without a showing of sufficient reliance, continued the district court, Mr. Tompkin could not sustain a misrepresentation claim under Ohio law. *See id.* at 906. The district court further held that the failure to show reliance also disposed of Mrs. Tompkin's common

law fraud and conspiracy claims. *See id.* at 909-10. Finally, citing the failure of Mrs. Tompkin's substantive claims, the district court granted Defendants summary judgment on Mrs. Tompkin's derivative damages, wrongful death, and consortium claims. After the district court denied her motion to alter and amend, Mrs. Tompkin filed this timely appeal.

## II.

This court reviews an order granting summary judgment *de novo*. *See Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Terry Barr*, 96 F.3d at 178. No genuine issue for trial exists when "the record taken as a whole could not lead a rational trier of fact to find for the non- moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, we must review the record, and any inferences derived therefrom, in the light most favorable to the non-moving party. *See id.* Accordingly, "when the non-moving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept the evidence as true." *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994).

## A.

On appeal, Mrs. Tompkin first contends that the district court erred in concluding that "common knowledge" of the risks of cigarette smoking immunized Defendants from liability under OPLA. OPLA governs products liability damages caused by:

1) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of [a] product; 2) Any warning or instruction, or lack of warning or instruction, associated with [a] product; [or]

decided before *White*. The *White* court plainly ruled that the common law implied warranty tort claim continues to exist notwithstanding OPLA, and therefore compels the conclusion that the district court erred in ruling otherwise.

## III.

Because we conclude that Mrs. Tompkin has demonstrated a genuine issue of material fact on the extent of "common knowledge" of the nexus between cigarette smoking and lung cancer, we **REVERSE** the district court's grant of summary judgment on Mrs. Tompkin's failure to warn and design defect claims. Additionally, we **AFFIRM** the district court's judgment that Mrs. Tompkin's negligence and wanton misconduct claims are pre-empted by OPLA, but **REVERSE** its preemption holding on her common law breach of implied warranty claim. Accordingly, we **REMAND** this case for further proceedings.[2]

---

[2]Mrs. Tompkin also moved to certify the issues she raised on appeal to the Ohio Supreme Court. Because this court has repeatedly addressed products liability claims under OPLA, *see supra*, we find no reason to certify this matter.

It is true, as Mrs. Tompkin contends, that in *Carrel v. Allied Products Corp.*, the Ohio Supreme Court held that the "common-law products liability causes of action survive the enactment of [OPLA] unless *specifically* covered by the Act." 677 N.E.2d 795, 800 (Ohio 1997) (emphasis in original). In *Carrel*, the Ohio Supreme Court allowed a plaintiff to pursue a common law negligent design claim even though OPLA covers claims pertaining to "[t]he design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of [a] product." Ohio Rev. Code § 2307.71(M). However, Mrs. Tompkin has not asserted a negligent design claim and has offered no authority for the proposition that her negligence claims are not governed by OPLA. Given the ruling of the *Amendola* court, and the *Paugh* court's directly on-point analysis, we find that Mrs. Tompkin's negligence claims are preempted by OPLA.

### C.

Finally, Mrs. Tompkin claims that the district court erred in holding that because a claim for breach of implied warranty "no longer exists separate and apart from the product liability theory of strict liability," this claim "fails to state a theory of recovery recognized by Ohio law." *Tompkin*, 10 F.Supp.2d at 900 (citing *Temple v. Wean United, Inc.*, 364 N.E. 2d 267 (Ohio 1977)). Under Ohio law, the common law claim for breach of implied warranty has merged into the claim for a strict liability action, and the claims are considered "virtually indistinguishable." *Temple*, 364 N.E. 2d at 270. However, while acknowledging often conflicting state caselaw on the issue, the Ohio Court of Appeals has recently held that "the common law cause of action of implied warranty in tort continues to exist even after the enactment of the Ohio Products Liability Act." *White v. DePuy, Inc.*, 718 N.E. 2d 450, 456 (Ohio Ct. App. 1998). Defendants cite the district court's opinion in *Jones v. American Tobacco Co.*, 17 F.Supp.2d 706, 721-22 (N.D. Ohio 1998), for the proposition that OPLA preempts any implied warranty claims. While the *Jones* court explicitly ruled, as per *Temple*, that the implied warranty claim no longer existed apart from OPLA, it was

3) Any failure of that product to conform to any relevant representation or warranty.

Ohio Rev. Code Ann. § 2307.71(M) (Anderson 1998). However, OPLA expressly exempts from liability products whose dangers are regarded as "common knowledge." *See* Ohio Rev. Code Ann. §§ 2307.75(E) & 2307.76(B). Specifically, a defendant is not liable for a purported design defect when "the harm for which the claimant seeks to recover compensatory damages . . . is recognized by the ordinary person with the ordinary knowledge common to the community." Ohio Rev. Code Ann. §§ 2307.75(E). In addition,

[a] product is not defective due to lack of warning or instruction or inadequate warning or instruction as a result of the failure of its manufacturer to warn or instruct about an open and obvious risk or a risk that is a matter of common knowledge.

*Id.* at 2307.76(B).

Relying on Dr. Hoff's report, Defendants assert that the health risks of cigarette smoking have been "common knowledge" for decades. While largely admitting that they engaged in pervasive tactics to distort the dangers of smoking, Defendants contend that "regardless of public statements defendants may have made with respect to the hazards of smoking, and regardless of defendants' advertising," *see* Brown and Williamson's Br. at 24, social science data show that the public was nevertheless aware of tobacco's health risks. Defendants further assert that Dr. Whelan's report does not contradict their "common knowledge" finding, as even she admitted that public opinion polls showed that, at the time Mr. Tompkin smoked, a "great majority" of the public believed smoking was dangerous to health. Defendants further contend that OPLA merely requires ordinary "common knowledge," rather than a purported "specialized" knowledge of the precise medical and scientific processes that lead from tobacco use to lung cancer. In this regard, Defendants contend that as long as the public knew that

tobacco was dangerous, it is irrelevant if it did not appreciate the specific maladies that might attend its use.

At the outset, we think it necessary to frame properly the issue we must decide. The pertinent issue here is not whether the public knew that smoking was hazardous to health at some undifferentiated level, but whether it knew of the specific linkages between smoking and lung cancer. Public awareness of a broad-based and ambiguous risk that smoking might be tenuously connected to lung cancer does not suggest "common knowledge" of the known scientific fact that cigarette smoking is a strong precipitant of lung cancer. *See, e.g., Burton v. R.J. Reynolds Tobacco Co.*, 884 F.Supp. 1515, 1526 (D. Kan. 1995) (rejecting assertion "that because there is general common knowledge that cigarettes are dangerous, users of cigarettes are therefore imputed with knowledge of the extent and nature of all dangers relating to cigarettes"). It is one thing to be aware generally that a product might have an attenuated and theoretical connection with a deadly disease like lung cancer; it is another altogether to comprehend that it is the cause of an overwhelming majority of lung cancer cases. *See* J.A. at 501. The "common knowledge" requirement is emasculated if a defendant may show merely that the public was aware that a product presented health risks at some vague, unspecified, and undifferentiated level.

Viewing the "common knowledge" issue through the proper lenses, we conclude that a rational jury could find the absence of "common knowledge," between 1950 and 1965, of the nature of the link between smoking and lung cancer. While Dr. Whelan concedes that an overwhelming majority of the public was aware that smoking was dangerous to health, and that opinion polls even showed an awareness of some connection between smoking and lung cancer, *see* J.A. at 601, she nevertheless concluded that there was "no reason to believe" that the public had any understanding of the nature of this connection. *See* J.A. at 604. Citing extensive data, including federal government reports, she concluded, "as far as I know, people thought cigarette smoke was simply as dangerous as breathing city air." *Id.* In this regard, Dr.

to Mrs. Tompkin, *see Adams*, 31 F.3d at 383, we hold that a rational factfinder could reasonably conclude that the public did not have "common knowledge" of the strong connection between cigarette smoking and lung cancer between 1950 and 1965. *See Burton*, 884 F.Supp at 1525-26 (denying summary judgment on the extent of "common knowledge" of tobacco's dangers between 1954 and 1969); *Hill v. R.J. Reynolds Tobacco Co.*, 44 F.Supp. 2d 837, 844 (W.D.Ky. 1999) (refusing to hold as a matter of law that the dangers of cigarette smoking were "common knowledge" prior to 1969); *Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F.Supp.2d 263, 271 (D. R.I. 2000) (asserting that "most of the courts considering the common knowledge of the general disease-related health risks of smoking have placed common knowledge at least at 1966"). *See also Rogers v. R.J. Reynolds Tobacco Co.*, 557 N.E.2d 1045, 1054 (Ind. App. 1990) (addressing the claims of a decedent who began smoking in 1940, and finding "[t]he state of knowledge attributable to the community of individuals consuming cigarettes has changed over time and will continue to do so."). Accordingly, we must reverse the district court's grant of summary judgment on Mrs. Tompkin's design defect and failure to warn claims.

### B.

Mrs. Tompkin additionally contends that the district court erred in concluding that OPLA preempted her negligence and wilful and wanton misconduct claims. This court has applied OPLA to product liability negligence claims and has therefore implicitly concluded that common law negligence claims have been preempted by OPLA. *See Amendola*, 1999 WL 1111, at *2 (holding that the plaintiff's negligent misrepresentation and negligent infliction of emotional distress claims are governed by OPLA). Additionally, the *Paugh* court, using the exact language used by Mrs. Tompkin in her Third Amended Complaint, held that a claim for negligence in the manner in which cigarettes were "tested, researched, sold, and promoted" fell under OPLA. *Paugh*, 834 F.Supp. at 230.

However, courts cannot determine whether the public was sufficiently aware of the risks of smoking without determining the nature of the known risk. Surely, if the ordinary person had an understanding of the harms of cigarette smoking that was wildly disproportionate to its actual danger, one may not characterize such misunderstanding as "common knowledge." The requirement that the public have "common knowledge" – as opposed to broad familiarity, or some other more generalized standard – informs that substantial incongruence between perceived and actual risk precludes a "common knowledge" finding. *See Burton*, 884 F.Supp. at 1526.

Defendants' citation of *Amendola*, *Consumers of Ohio* and *Allgood* are also misplaced. While the *Amendola* court found "common knowledge" under OPLA regarding the dangers of smoking, it expressly rooted its finding in the fact that Amendola continued to smoke until 1998. *See Amendola*, 1999 WL 1111515, at *3. Similarly, the *Consumers of Ohio* court explicitly limited its "common knowledge" finding to the present, holding that "[t]he extensive information that *is now available* regarding smoking tobacco precludes a jury question as to whether the risks involved are known by the average consumer." 1995 WL 234620, at * 1 (emphasis added). Finally, in *Allgood*, the Fifth Circuit relied on *Roysdon* and *Paugh* in concluding that "the dangers of cigarette smoking have long been known to the community." *Allgood*, 80 F.3d at 172. Similar to the *Paugh* court, however, the *Allgood* court made no attempt to inquire into the extent of knowledge regarding the link between smoking and lung cancer, or to specify the nature of risk the public allegedly knew. It simply made a bare finding that people believe smoking has health hazards. Such a vague finding is an insufficient predicate for concluding as a matter of law that the nexus between cigarette smoking and lung cancer was "common knowledge" during the period Mr. Tompkin smoked.

In short, crediting the report and deposition of Dr. Whelan as true and reading all inferences in the light most favorable

Whelan described the public's understanding of the nexus between smoking and lung cancer as "hypothetical." *Id.* at 613. Indeed, the uncertain and incomplete quality of the public's contemporaneous awareness of tobacco's dangers is exemplified by FTC findings that almost half of smokers mistakenly believed that *only heavy smoking* posed a health hazard. *See* J.A. at 501.

Moreover, in enacting the 1966 Labeling Act and its successive amendments in 1969 and 1984, Congress may have implicitly recognized that the link between smoking and lung cancer was not "common knowledge." The Labeling Act created a "comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health," and was explicitly designed to ensure that "the public may be adequately informed that cigarette smoking may be hazardous to health." Pub.L. 89-92, § 2, 79 Stat. 282 (codified at 15 U.S.C. § 1331); *see Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 120 S.Ct. 1291, 1309 (2000). It was not until the 1984 amendments to the Labeling Act that Congress finally required cigarette packages to warn that smoking causes lung cancer. *See* Pub.L. 98-474, 98 Stat. 2201. Given that the Labeling Act was expressly designed to "adequately inform[]" the public of the dangers of cigarette smoking, the Act implies that prior to its 1966 enactment, a substantial portion of the public was under-informed as to the specific dangers posed by smoking.

Additionally, we are unmoved by Defendants' contentions that Mrs. Tompkin's claims require the ordinary person to have scientific or medical knowledge of cigarette smoking's risks. It does not take specialized knowledge for the public to be made aware that there is a strong correlation between smoking and lung cancer. Neither does it take specialized knowledge to comprehend that most lung cancer patients contract the disease through smoking, or that the probability of contracting cancer from smoking is much higher than the vague understanding attested to by Dr. Whelan. In short, it does not take a public health specialist to understand that

"Smoking Causes Lung Cancer," the warning the eventual 1984 amendments to the Labeling Act mandated.

Finally, Defendants attempt to marshal caselaw in support of their claim that, between 1950 and 1965, the link between tobacco and lung cancer was sufficiently known to constitute "common knowledge" under OPLA. In *Roysdon v. R.J. Reynolds Tobacco Co.*, 849 F.2d 230 (6th Cir. 1988), we held that the dangers of cigarette smoking were sufficiently known to preclude an "unreasonably dangerous" claim under Tennessee law. *Id.* at 236. Under Tennessee law, an "unreasonably dangerous" claim requires a showing that cigarettes are "dangerous to an extent beyond that which could be contemplated by the ordinary consumer who purchases it with the ordinary knowledge common to the community as to its characteristics." *Id.* (quoting Tenn. Code. Ann. § 29-28-102(8)). Thus, an "unreasonably dangerous" claim under Tennessee law tracks the language of OPLA, as both provisions require that courts determine product liability by assessing the public's awareness of a product's harms.

*Roysdon*, however, addressed the extent of public knowledge on smoking's dangers between 1974 and 1984. *See id.* at 232. While the *Roysdon* court cited the *Roysdon* district court's broad conclusion that "[k]nowledge that cigarette smoking is harmful to health is widespread and can be considered part of the common knowledge of the community," we affirmed summary judgment on the expressed basis that "this action was limited to [1974 to1984]." *Id.* at 236. The *Roysdon* court underscored the time-sensitive nature of its holding by concluding: "The extensive information regarding the risk of smoking available to the public *during that time* precluded the existence of a jury question as to whether cigarettes are unreasonably dangerous." *Id.* (emphasis added). Accordingly, *Roysdon* is not precedent for the extent of public knowledge regarding

the nexus between smoking and lung cancer from 1950 to 1965.[1]

Defendants also cite the district court's decision in *Paugh v. R.J. Reynolds Tobacco Co.*, 834 F.Supp. 228 (N.D. Ohio 1993), this Circuit's unpublished decisions in *Amendola v. R.J. Reynolds Tobacco Co.*, No. 98-4506, 1999 WL 1111515 (6th Cir. 1999) (unpublished opinion) and *Consumers of Ohio v. Brown & Williamson Tobacco Corp.*, No. 94-3574, 1995 WL 234620 (6th Cir. 1995) (unpublished opinion), and the Fifth Circuit's decision in *Allgood v. R.J. Reynolds Tobacco Co.*, 80 F.3d 168 (5th Cir. 1996). Defendants' reliance on these cases is mistaken. In *Paugh*, the district court relied heavily on *Roysdon* in finding that the dangers of cigarette smoking are "common knowledge" under OPLA, and that "knowledge of these risks has been common to the community since well before 1966." 834 F.Supp. at 231. The district court in *Paugh* did not seek to specify precisely the risks that were "common knowledge" prior to 1966, asserting whether "some . . . underestimate these risks has little bearing" on the "common knowledge" inquiry. *Id.*

---

[1] We also find unpersuasive Defendants' citation of the *Roysdon* court's recognition that "knowledge regarding [Plaintiff's] specific medical problem is irrelevant in light of the serious nature of the other diseases known [between 1974 and 1984] to be caused by cigarette smoking." *Roysdon*, 849 F.2d at 236. In addition to the relevant time frame of *Roysdon*, Defendants have not demonstrated the absence of a genuine issue of material fact on whether the public was aware, in 1950, that some other death-causing maladies were caused by lung cancer. Without establishing "common knowledge" with respect to some comparably incapacitating disease, the *Roysdon* court's interpretation of Tennessee law does not help Defendants' cause. We also note that with respect to Mrs. Tompkin's design defect claim, OPLA's "common knowledge" defense specifically requires that "*the harm for which the claimant seeks to recover* compensatory damages . . . is recognized by the ordinary person with the ordinary knowledge common to the community." Ohio Rev. Code Ann. §§ 2307.75(E) (emphasis added). This language plainly does not allow a defendant to assert a "common knowledge" defense with respect to harms other than those asserted by an OPLA plaintiff.